795 A.2d 250

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. WILLIAM
DANGERFIELD, DEFENDANT–RESPONDENT.

Argued January 3, 2002—Decided April 24, 2002.

448

*Mark P. Stalford,* Assistant Prosecutor, argued the cause for appellant (*John A. Kaye,* Monmouth County Prosecutor, attorney; *Mary R. Juliano,* Assistant Prosecutor, on the brief).

*Sylvia M. Orenstein,* Assistant Deputy Public Defender, argued the cause for respondent (*Peter A. Garcia,* Acting Public Defender, attorney).

*Linda K. Danielson,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*John J. Farmer, Jr.,* Attorney General, attorney).

*David A. Ruhnke,* argued the cause for amicus curiae Association of Criminal Defense Lawyers—New Jersey (*Ruhnke & Barrett,* attorneys).

The opinion of the Court was delivered by

COLEMAN, J.

The issue raised in this appeal is whether the police had probable cause to arrest defendant for defiant trespass and, if probable cause existed, whether the police should be permitted to conduct a full body search incident to an arrest for a petty disorderly persons offense. The trial court found that the State failed to establish probable cause and suppressed the evidence seized from defendant. On leave granted the Appellate Division affirmed, holding that there was no probable cause to arrest defendant for trespassing and, even if probable cause existed to arrest him, he presumptively was entitled to be released on issuance of a summons. *State v. Dangerfield,* 339 *N.J.Super.* 229, 238, 240, 771 *A.*2d 642 (App.Div.2001). We hold that there was no probable cause to arrest defendant for trespassing. We also hold that although our court rules do not restrict the statutory authority of the police to arrest for minor offenses committed in their presence, the search of defendant incident to the arrest was improper.

I.

The facts in this case were developed at a hearing on a motion filed pursuant to *Rule* 3:5–7 to suppress evidence seized from defendant's person. The State and the defense presented contradictory evidence of the confrontation leading to the arrest of defendant and the search of his person. The following is a summary of that conflicting evidence.

On November 2, 1999 at approximately 6:40 p.m., Detective Raymond Chapparo, Jr. and his partner Detective Mooney of the Long Branch Police Department were dressed in plainclothes and driving south on Liberty Street in an unmarked car. They were targeting Grant Court and Garfield Court Federal Housing Complexes for trespassing and drug violations. The detectives got out of their vehicle after they observed a person sitting on a bicycle between two buildings in Grant Court while it was raining. As he approached the buildings, Detective Chapparo, who was familiar with defendant, recognized defendant as the person on the bicycle. When Detective Chapparo was within fifteen or twenty feet of defendant, defendant began to ride away. Detective Chapparo chased him, grabbed his arm and stopped him within fifteen to twenty feet. Upon seizing defendant, Detective Chapparo asked him his reason for being in Grant Court and why he had tried to flee. When defendant responded that he was "doing nothing," Detective Chapparo placed him under arrest for trespassing. A search of defendant's person revealed two bags of cocaine in his front left pocket. Subsequently, defendant was indicted for possession of cocaine, a violation of *N.J.S.A.* 2C:35–10a(1).

The State relies on relevant background information to support its probable cause claim. Detective Chapparo had had two prior encounters with defendant. The first occurred approximately one and a half to two years earlier when Detective Chapparo stopped defendant in Garfield Court. Detective Chapparo terminated his questioning of defendant when he produced an identification card issued by the Housing Authority to support his assertion that he was one of its employees. The detective later learned from Dave Brown, Director of the Housing Authority at the time, that defendant had been but no longer was a Housing Authority employee.

The second encounter occurred when Detective Chapparo stopped defendant as he was leaving Grant Court after visiting a friend. When confronted with the information obtained from Dave Brown, defendant insisted that he worked for Randy Phil-

lips, the Director of the Grant Court complex and produced an identification card. Detective Chapparo released him again. Subsequently, Phillips informed Detective Chapparo that defendant did not work for the complex. Finally, when on another occasion Detective Chapparo arrested defendant on unspecified charges several months prior to November 2, 1999, he was employed by Monmouth University.

The Grant Court and Garfield Court Federal Housing Complexes are plagued by drug activity. The Grant Court complex consists of eight to ten buildings, each containing ten apartments. Garfield Court has twenty buildings with ten to fifteen apartments in each building and is located across the street from Grant Court. At the end of each building, clearly visible signs warn against trespassing. Despite those efforts, controlled dangerous substances are used on the premises by individuals who tend to "hang out" in the complexes, and drugs also are sold from different apartments.

There were established procedures for apprehending trespassers within the housing complexes. When an individual is stopped inside one of the complexes, police officers are instructed to ask his or her purpose for being there. If the individual stated that he or she was visiting a resident, the officers would try to confirm that explanation by taking the visitor to the apartment in question or having headquarters call the resident to confirm that the resident was familiar with the visitor. For that purpose, management had provided the officers with a list of all tenants in the complexes. If the visitor provided the name of someone on the list, he or she usually was released. If a name was not provided, the police would go to the specific apartment with the visitor. If the resident did not know the visitor, or the visitor had otherwise lied, he or she would be arrested for trespassing.

Defendant and two other witnesses testified on his behalf and they described the encounter differently. Defendant testified that he had gone to the complex to visit his young son Billy, who lived with his mother at 23 Grant Court. Billy's grandmother also lived

in the complex but in the building across from where defendant was seated on his bicycle. Defendant testified that before the police arrived he had been in the complex for approximately fifteen minutes playing with his son on a walkway between the two buildings where the child's mother and grandmother lived. His son went to his grandmother's house when it began to rain. He said there were two other individuals in the vicinity: a woman, with whom defendant was talking, and another man. As Detectives Chapparo and Mooney approached to talk to the man, defendant started to leave because "Chapparo always liked to hassle me sometimes. Sometimes he kids. Sometimes he doesn't. But you know, I just doesn't [sic] want to have anything to do with it."

Defendant testified that as he rode away on his bicycle, Detective Chapparo ran up to him, grabbed him by the shoulder and told him to come back. Defendant insisted that Detective Chapparo never asked him why he was in the housing complex or informed him that he was under arrest, but immediately searched his pockets and found the cocaine. Defendant also testified that Detective Chapparo had seen him in the area "many times." Further, if Detective Chapparo had asked him what he was doing there on November 2, 1999, defendant would have told him that he was visiting his son and his son's grandmother.

In addition to his own testimony, defendant produced two additional witnesses. The mother of his son, Tracy Fann, testified that she and her son lived in Grant Court on November 2, 1999 when defendant was arrested for trespass. She testified that until defendant's arrest he had visited his son almost daily. Fann testified that she informed the police that defendant was the father of her son and that defendant "visited quite frequently." She stated that the police had never informed her that defendant was not welcome in the complex. She also stated that on prior occasions she had observed the police pass defendant as he approached her apartment without stopping defendant for trespassing. Although she could not specifically remember his visit on

November 2, 1999, she testified that her son came home that day and told her that his father had given him money.

Randolph Phillips, Director of Management for the Long Branch Housing Authority, testified that he had known defendant for six or seven years. He confirmed that he knew Fann lived in Grant Court in November 1999 and that he had no reason to think defendant was not welcome there. Further, although Phillips had spoken to the police about keeping certain individuals out of the complex, he never sought to keep defendant out of the complex. Phillips also stated that defendant used to clean the administrative office for the Housing Authority. However, at the time of his arrest defendant was no longer employed by the Housing Authority, but was working for Phillips personally in Phillips's home, which was located a short distance from the complexes.

The trial court found credible the testimony of Detective Chapparo, Fann and Phillips and concluded that defendant was not a trespasser because he had been visiting his son and believed that he was welcome. The court found that defendant fit within the statutory defense to the trespass statute because he "reasonably believed that the owner of the structure, or other person empowered to license access thereto, would have licensed him to enter or remain," and that there was no basis for his arrest and search. *N.J.S.A.* 2C:18–3d(3). Accordingly, the court suppressed the evidence seized during the search.

The State filed a motion for reconsideration, arguing that the arrest for defiant trespass was based on probable cause. The court rejected that argument, stating that although it found Chapparo to be credible, that did not necessarily mean that his arrest was based on probable cause. The court concluded that probable cause did not exist and that defendant was arrested by Detective Chapparo based on nothing more than a hunch.

The State was granted leave to appeal the interlocutory order suppressing the evidence. The Appellate Division affirmed the suppression order in a published opinion. *State v. Dangerfield,* 339 *N.J.Super.* 229, 236, 771 *A.*2d 642 (2001). We granted the

State's motion for leave to appeal. 169 *N.J.* 597, 782 *A.*2d 418 (2001).

## II.

The State, through the Monmouth County Prosecutor, argues that there was probable cause for defendant's arrest and that the search of defendant was incident to his arrest as a petty disorderly person for being a defiant trespasser under *N.J.S.A.* 2C:18–3b. The Attorney General, as *amicus curiae,* argues that an arrest for offenses under the New Jersey Code of Criminal Justice provides a constitutionally valid basis to search incident to that arrest. The Public Defender, and the Association of Criminal Defense Lawyers of New Jersey as *amicus curiae,* argue that no probable cause existed to arrest defendant and, even if it existed, our State Constitution should be interpreted to limit the authority of police officers to arrest for disorderly and petty disorderly persons offenses and to restrict searches conducted incident to those arrests.

## A.

■ The starting point for a determination of whether defendant's arrest for defiant trespass was proper is the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution. Both protect citizens against unreasonable police searches and seizures by requiring warrants issued on probable cause " 'unless [the search] falls within one of the few well-delineated exceptions to the warrant requirement.' " *State v. Maryland,* 167 *N.J.* 471, 482, 771 *A.*2d 1220 (2001) (quoting *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043, 36 *L.Ed.*2d 854, 858 (1973)). Any warrantless search is *prima facie* invalid unless the search falls within one of the exceptions that the United States Supreme Court has recognized. *State v. Hill,* 115 *N.J.* 169, 173–74, 557 *A.*2d 322 (1989). The present case involves the search incident to a lawful arrest exception articulated in *Chimel v. California,* 395 *U.S.* 752, 89

*S.Ct.* 2034, 23 *L.Ed.*2d 685 (1969). That exception, however, requires that there be probable cause to arrest. The first critical issue, therefore, is whether there was probable cause to arrest defendant.

"Probable cause exists if at the time of the police action there is 'a well grounded suspicion that a crime has been or is being committed.' " *State v. Sullivan,* 169 *N.J.* 204, 211, 777 *A.*2d 60 (2001) (quoting *State v. Waltz,* 61 *N.J.* 83, 87, 293 *A.*2d 167 (1972)) (internal quotation marks omitted). It requires nothing more than " 'a practical, common-sense decision whether, given all the circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. Demeter,* 124 *N.J.* 374, 380–81, 590 *A.*2d 1179 (1991) (quoting *Illinois v. Gates,* 462 *U.S.* 213, 238, 103 *S.Ct.* 2317, 2322, 76 *L.Ed.*2d 527, 548 (1983)); *State v. Novembrino,* 105 *N.J.* 95, 117–18, 519 *A.*2d 820 (1987). The flexible, practical totality of the circumstances standard has been adopted because probable cause is a " 'fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.' " *Schneider v. Simonini,* 163 *N.J.* 336, 361, 749 *A.*2d 336 (2000) (quoting *Illinois v. Gates, supra,* 462 *U.S.* at 232, 103 *S.Ct.* at 2329, 76 *L.Ed.*2d at 544), *cert. denied,* 531 *U.S.* 1146, 121 *S.Ct.* 1083, 148 *L.Ed.*2d 959 (2001). Finally, the reasonableness of Detective Chapparo's actions must be considered in light of "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio,* 392 *U.S.* 1, 27, 88 *S.Ct.* 1868, 1883, 20 *L.Ed.*2d 889, 909 (1968).

As an appellate court, we are required to give " 'deference to those findings of the trial [court that] are substantially influenced by [its] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.' " *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999) (quoting *State v. Johnson,* 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964)); *accord State v. Simon,* 161 *N.J.* 416, 445, 737 *A.*2d 1 (1999); *In re*

*Taylor,* 158 *N.J.* 644, 660, 731 *A.*2d 35 (1999). Thus, we defer to the trial court's finding that Detective Chapparo's version of the confrontation was credible and that most of the testimony presented by Fann and Phillips also was credible.

■ Based on the totality of the circumstances, the facts in this case fail to establish that probable cause existed to arrest defendant. The facts known to Detective Chapparo do not support a well-grounded suspicion that defendant was "not licensed or privileged ... to enter[ ] or remain[ ]" at the Grant Court Complex, the critical elements of defiant trespass under *N.J.S.A.* 2C:18–3b, or otherwise was engaged in criminal activity. More specifically, there was nothing to suggest that defendant was trespassing, the petty disorderly persons offense for which he was arrested. Detective Chapparo had seen defendant inside both Grant Court and Garfield Court before, and on both of those occasions defendant had a valid reason for being there. In their first encounter, defendant was a Housing Authority employee; on the second occasion, defendant was visiting a friend. Both explanations were legitimate and lawful, as evidenced by Detective Chapparo's allowing defendant to proceed.

■ Furthermore, after making his initial inquiry, Detective Chapparo arrested defendant without following established police procedures for determining whether defendant was lawfully on the premises. For example, pointing out the "no trespassing" signs may have encouraged defendant to explain that he was playing with his son a few minutes earlier. Defendant never was asked whether he knew or was visiting anyone at the complex. Such questioning was part of the established practice and procedure for approaching suspected trespassers. Those procedures required the detective first to ask an individual the reason he or she was in the complex, and then to confirm the story by either checking a tenant list or by taking the individual to a specific apartment for confirmation. Although defendant rode away on his bicycle after observing the detectives, flight alone does not create reasonable suspicion for a stop, let alone probable cause. *State v. Tucker,* 136

*N.J.* 158, 169, 642 *A*.2d 401 (1994). There simply was no reasonable articulable suspicion to which the flight could add weight. *State v. Citarella,* 154 *N.J.* 272, 281, 712 *A*.2d 1096 (1998). Accordingly, we agree with the Appellate Division that "there was no reasonable suspicion for [defendant's] stop and no probable cause for his arrest [and therefore] no justification for the ensuing search." *Dangerfield, supra,* 339 *N.J.Super.* at 238, 771 *A*.2d 642.

## B.

The Appellate Division also held that "defendant was presumptively entitled to be released upon the issuance of a summons, rather than being arrested." *Id.* at 240, 771 *A*.2d 642. In reliance on *State v. Pierce,* 136 *N.J.* 184, 642 *A*.2d 947 (1994) and *State v. Hurtado,* 219 *N.J.Super.* 12, 529 *A*.2d 1000 (App.Div.1987), *rev'd on dissent,* 113 *N.J.* 1, 549 *A*.2d 428 (1988), the court noted that the modern view favors the issuance of citations and summonses over custodial arrests for minor offenses. The court reasoned that even if there had been probable cause to arrest, *Rule* 3:3–1 provides that a summons should be issued, rather than a warrant, unless certain exceptions apply. Among the exceptions or reasons for allowing the issuance of a warrant rather than a summons are "reason[s] to believe that the defendant is dangerous to self, other persons, or property," *Rule* 3:3–1(c)(3), situations where "the defendant's identity or address is not known and a warrant is necessary to subject the defendant to the jurisdiction of the court," *Rule* 3:3–1(c)(5), and where "there is reason to believe that the defendant will not appear in response to a summons." *Rule* 3:3–1(c)(6). Because none of those exceptions applied in this case, the court concluded that defendant should have been issued a summons. *Dangerfield, supra,* 339 *N.J.Super.* at 241, 771 *A*.2d 642. Had defendant received a summons there would have been no basis for a search.

The Appellate Division also concluded that even if a warrant was issued and bail was required, a full body search should not have occurred until after defendant had a reasonable opportunity

to post bail. Thus, the court disagreed with the reasoning of another Appellate Division panel in *State v. Vonderfecht*, 284 *N.J.Super.* 555, 560, 665 *A.*2d 1145 (App.Div.1995), that held that a police officer could arrest an individual for a disorderly or petty disorderly persons offense and thereafter carry out an inventory search at the police station. The court in *Dangerfield* noted that *Vonderfecht* did not address the relevant court rules and relied on cases with facts different from the facts in the present case. *Dangerfield, supra,* 339 *N.J.Super.* at 242–43, 771 *A.*2d 642.

The State, through the Monmouth County Prosecutor, argues that the Appellate Division erroneously distinguished between non-custodial and custodial arrests. The State maintains that *N.J.S.A.* 40A:14–152 authorized Detective Chapparo to arrest defendant as a "disorderly person," which includes petty disorderly persons, *State v. Vonderfecht, supra,* 284 *N.J.Super.* at 558, 665 *A.*2d 1145, and because *Rule* 3:4–1 required the detective to take a person arrested without a warrant to the police station, he was permitted to search defendant's person for safety reasons incident to that arrest. The Attorney General, as *amicus curiae,* argues that the Appellate Division improperly has narrowed the arrest and search powers of the police with respect to offenses under the New Jersey Code of Criminal Justice. He also argues that the court below has misinterpreted *Rule* 3:3–1 and *Rule* 3:4–1 as they relate to post-arrest procedures for warrantless arrests. He maintains that those two rules were intended only to provide guidelines for the issuance of summons and arrest warrants, not to diminish law enforcement's authority to arrest or search incident to arrest.

We agree that neither *Pierce* nor *Rule* 3:3–1 supports the conclusion that defendant should have been issued a summons and not arrested. This Court's decision in *Pierce* addressed whether New Jersey should adopt a bright-line automobile search exception to the warrant requirement articulated in *New York v. Belton,* 453 *U.S.* 454, 101 *S.Ct.* 2860, 69 *L.Ed.*2d 768 (1981). *Pierce* dealt with a motor vehicle statute, *N.J.S.A.* 39:5–25, that authorizes

arrests or issuance of a summons for certain traffic offenses committed in the presence of the arresting officer without "suggest[ing] whether arrest or summons is appropriate" in respect of a specific violation. *State v. Pierce, supra,* 136 *N.J.* at 190–91, 642 *A.*2d 947. For that reason, the *Pierce* Court looked to "other sources of law [for] standards that should inform police officers in the exercise of their statutory [discretionary] authority." *Id.* at 191, 642 *A.*2d 947. The Court examined *Rule* 3:3–1 and concluded that "[a]bsent a complaint alleging commission of one of the offenses designated by the Code of Criminal Justice (Code), the Rule prescribes [when] a court should issue a summons rather than an arrest warrant." *Ibid. Pierce* acknowledged that "similar standards are contained in *Rule* 3:4–1 to guide officers who have made warrantless arrests in determining whether to apply to the court for a summons or an arrest warrant in respect of the arrested person." *Id.* at 192, 642 *A.*2d 947.

In this case, *N.J.S.A.* 40A:14–152 authorizes municipal police officers to arrest any "disorderly person" who commits such an offense in the presence of the arresting officer. Although Section 152 does not specifically include the power to issue a summons, we consider that power to be ancillary to an officer's discretionary authority to determine, under the prevailing circumstances and as outlined in *Rule* 3:3–1(c), whether an arrest or a summons is appropriate. "We do not mean discretion whether or no[t] the law should be enforced but discretion as to the steps to be taken toward that end." *State v. Orecchio,* 27 *N.J.Super.* 484, 492, 99 *A.*2d 595 (App.Div.1953), *aff'd,* 16 *N.J.* 125, 106 *A.*2d 541 (1954); *accord State v. Secula,* 153 *N.J.Super.* 539, 544, 380 *A.*2d 713 (App.Div.1977). Nonetheless, because the statute focuses on arrest, we conclude that neither *Pierce* nor *Rule* 3:3–1 is controlling here. Accordingly, we do not disturb the authority of the police to arrest for disorderly and petty disorderly persons offenses that occurred in their presence. Any limitation of the

power of arrest for Code offenses should come from the Legislature.

 That said, a contemporaneous search incident to an arrest exception to the warrant requirement is not limitless in terms of purpose or scope. The purpose of such a search is (1) to protect the arresting officer from any potential danger and (2) to prevent the destruction or concealment of evidence. The protective search for weapons is restricted to a *Terry* frisk. *Chimel v. California, supra,* 395 *U.S.* at 762–63, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 693–94. The scope of that search is restricted to the person of the arrestee and the area within his or her immediate control, meaning "the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 694. A contemporaneous search incident to a lawful arrest is permitted to remove from the arrestee's reach things that might be used to assault an officer or effect an escape as well as to prevent the destruction of evidence of the crime for which the individual has been arrested. Because defendant was arrested as a defiant trespasser, there was no reasonable basis to believe that he could have been in possession of, or was concealing, evidence of that offense. It is beyond dispute that the State Police and municipal police officers have the power to arrest a suspect for defiant trespass. *N.J.S.A.* 53:2–1; *N.J.S.A.* 40A:14–152. Given that the Court has declined to limit the power of arrest for minor offenses under the Code, the critical question is whether the scope of a search of the arrestee's person incident to an arrest for a minor offense under the Code should be more restrictive under the New Jersey Constitution than that permitted under the Fourth Amendment.

Under the *Chimel* standard, the nature of the offense for which probable cause existed to permit the arrest and the surrounding circumstances, rather than the seriousness of the offense, significantly influence the decision whether the arrestee may possess evidence of the crime for which he or she has been arrested. "We recognize that this Court has the power to afford citizens of this State greater protection against unreasonable searches and seizures than may be required by the Supreme Court's prevailing interpretation of the Fourth Amendment." *State v. Bruzzese,* 94

*N.J.* 210, 216, 463 *A.*2d 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984); *see State v. Novembrino, supra,* 105 *N.J.* at 144–45, 519 *A.*2d 820; *State v. Gilmore,* 103 *N.J.* 508, 522, 511 *A.*2d 1150 (1986); *State v. Hunt,* 91 *N.J.* 338, 344–46, 450 *A.*2d 952 (1982); *State v. Alston,* 88 *N.J.* 211, 225, 440 *A.*2d 1311 (1981); *State v. Johnson,* 68 *N.J.* 349, 353, 346 *A.*2d 66 (1975). Generally, we have not afforded greater protection regarding the scope of a search incident to a lawful arrest under our State Constitution than that provided in *Chimel's* interpretation of the Fourth Amendment. *State v. Pierce, supra,* 136 *N.J.* at 214–15, 642 *A.*2d 947; *State v. Henry,* 133 *N.J.* 104, 118–19, 627 *A.*2d 125, *cert. denied,* 510 *U.S.* 984, 114 *S.Ct.* 486, 126 *L.Ed.*2d 436 (1993); *State v. Welsh,* 84 *N.J.* 346, 353–56, 419 *A.*2d 1123 (1980); *State v. Patino,* 83 *N.J.* 1, 8–9, 414 *A.*2d 1327 (1980); *State v. Doyle,* 42 *N.J.* 334, 344, 200 *A.*2d 606 (1964); *State v. Bradley,* 291 *N.J.Super.* 501, 509–11, 677 *A.*2d 1129 (App.Div.1996). Nonetheless, unlike the Supreme Court's holdings permitting a full-body search of persons arrested for minor traffic offenses, *see, e.g., Atwater v. City of Lago Vista,* 532 *U.S.* 318, 345–55, 121 *S.Ct.* 1536, 1553–57, 149 *L.Ed.*2d 549, 571–78 (2001) (holding that Fourth Amendment does not forbid warrantless arrest for fine-only offense of not wearing seatbelt nor search incident to that arrest at police station); *New York v. Belton, supra,* 453 *U.S.* at 460, 101 *S.Ct.* at 2864, 69 *L.Ed.*2d at 774–75 (holding that police may arrest for fine-only offense of minor traffic violation and conduct contemporaneous search of motor vehicle's passenger compartment, its occupants and closed containers as incident to lawful arrest); *United States v. Robinson,* 414 *U.S.* 218, 236, 94 *S.Ct.* 467, 477, 38 *L.Ed.*2d 427, 441 (1973) (holding that after arrest of defendant for driving while on revoked list, search of arrestee's person is reasonable under Fourth Amendment), we have interpreted some provisions of the Motor Vehicle Code to hold that the police may not undertake full-blown searches of a motor vehicle or its occupants based on contemporaneous arrests for minor motor vehicle violations. *State v. Pierce, supra,* 136 *N.J.* at 209–10, 642 *A.*2d 947.

But, as *Pierce* observed, our restrictive approach concerning arrests for minor traffic offenses is not applicable to Code offenses. Moreover, we imply no modification here of our holding in *Pierce, supra*, 136 *N.J.* at 213–214, that recognizes "the right of a police officer, following a valid custodial arrest for a motor vehicle violation or for a criminal offense, to conduct a search of the person of the arrestee soley on the basis of the lawful arrest."

■ Once defendant was arrested, our court rules outline the post-arrest procedure for warrantless arrests. *Rule* 3:4–1(a)(1) provides: "A law enforcement officer *shall* take a person who was arrested without a warrant to a police station where a complaint *shall* be prepared immediately." (Emphasis added). That rule was promulgated by this Court pursuant to Article VI, § 2, paragraph 3 of the New Jersey Constitution. *See Winberry v. Salisbury*, 5 *N.J.* 240, 247–48, 74 *A.2d* 406, *cert. denied*, 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950). "[T]he Court's authority to engage in rule making includes the exclusive power to establish or modify Court Rules through judicial decisions." *State v. Clark*, 162 *N.J.* 201, 205, 744 *A.2d* 109 (2000). We now modify *Rule* 3:4–1(a)(1) and hold that if, after making a non-pretexual warrantless arrest for a disorderly or petty disorderly persons offense under the Code, the officer, in the exercise of his or her discretion, wishes to issue a summons pursuant to *Rule* 3:3–1(b)(2) on being satisfied that *Rule* 3:3–1(c) does not require the issuance of a warrant, he or she need not transport the arrestee to a police station to prepare a complaint-summons contemplated by *Rule* 3:4–1(a)(1). Accordingly, we refer the matter to the Criminal Practice Committee to draft an appropriate amendment to *Rule* 3:4–1(a)(1) that is consistent with this opinion. The Criminal Practice Committee, if deemed necessary, may refer the matter to the Muncipal Court Practice Committee to draft appropriate changes to the Part VII Rules that may be required by this opinion.

■ Because probable cause to arrest defendant was lacking, the search incidental to that arrest was invalid. Therfore, we need not resolve in this appeal whether any limitations are appropriate on the right of police officers to search an arrestee in

connection with a *valid* arrest for the petty disorderly persons offense of defiant trespass. We also infer that the Rule modification authorized by this opinion will diminish the frequency of custodial arrests for such an offense and therefore reduce as well the frequency of searches related to such arrests. As the Appellate Division observed, in this typical defiant trespass case "there is no evidence or instrumentality of the offenses" that would have justified a search of defendant. *Dangerfield, supra,* 339 *N.J.Super.* at 242, 771 *A.*2d 642. Moreover, we also agree that "there is nothing in the record to support a [*Terry* ] frisk of defendant for weapons." *Id.* at 243, 771 *A.*2d 642; *see State v. Valentine,* 134 *N.J.* 536, 551–52, 636 *A.*2d 505 (1994); *State v. Thomas,* 110 *N.J.* 673, 680–81, 542 *A.*2d 912 (1988). Under the Fourth Amendment, a pat-down or frisk is "permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer[ ] in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long,* 463 *U.S.* 1032, 1049, 103 *S.Ct.* 3469, 3481, 77 *L.Ed.*2d 1201, 1220 (1983) (quoting *Terry v. Ohio, supra,* 392 *U.S.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906). No such facts were presented in this record.

## III.

The disposition of the Appellate Division is modified insofar as it holds that a petty disorderly persons offense under the Code should be treated differently than other Code offenses regarding the arrest power of the police. On that issue, we agree with the decision in *Vonderfecht.* We also modify the Appellate Division's alternative holding that a police officer is required to issue a summons in lieu of making a warrantless arrest for some minor offenses under the Code. In all other respects, we affirm the judgment under review.

Modified and affirmed.

*For affirmance as modified*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.