838 A.2d 498 (2004)
365 N.J. Super. 127
Alberto DELACRUZ and Lenita DelaCruz, his wife, Plaintiffs-Appellants/Cross-Respondents,
v.
BOROUGH OF HILLSDALE, Borough of Ho-Ho-Kus, Borough of Saddle River, Township of Washington, Police Department of the Borough of Hillsdale, Police Department of the Borough of Ho-Ho-Kus, Police Department of the Borough of Saddle River, Police Department of the Township of Washington, Officer Robert LaBianca, Officer Frank Novakowski, Sergeant Robert Breese, Officer Eugene Schultz, Sergeant Robert Orr, Defendants-Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 2003.
Decided January 6, 2004.
*501 Richard S. Lehrich, Cranford, argued the cause for appellants/cross-respondents.
Christopher C. Botta argued the cause for respondents/cross-appellants (Huntington Carver, attorneys; Mr. Botta, of counsel and on the brief).
Before Judges PETRELLA, COLLESTER and FUENTES. *499
*500 The opinion of the court was delivered by *502 FUENTES, J.A.D.
The principal issue raised in this appeal is whether the verbal threshold provision of the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:9-2(d), bars a claim based on false arrest/false imprisonment where the only injury sustained by the plaintiff is the wrongful deprivation of his freedom. We hold that N.J.S.A. 59:3-3 exempts false arrest/false imprisonment claims from the limitations of section 59:9-2(d) of the TCA. In so doing, we express our disagreement with the holding in Marion v. Borough of Manasquan, 231 N.J.Super. 320, 555 A.2d 699 (App.Div.1989).
Plaintiff[1] brought suit seeking monetary damages against the municipal defendants, their respective police departments and individual police officers, alleging civil rights violations under 42 U.S.C.A. § 1983 and state claims of false arrest/false imprisonment and excessive force. The case was tried before a jury. After both sides rested, the Law Division dismissed, as a matter of law, plaintiff's federal civil rights claims against the individual police officers and their respective municipal employers. The court also determined that the TCA threshold applied to plaintiff's claim of false arrest/false imprisonment. Because plaintiff did not present any evidence to vault the threshold, the court dismissed the false arrest/false imprisonment claim.
The only claims permitted to reach the jury were those involving allegations of excessive force against defendants Novakowski and Schultz. The jury returned a verdict against these defendants, finding that each used excessive force against plaintiff. The jury awarded plaintiff $20,000 in compensatory damages, apportioning liability forty percent to Novakowski and sixty percent to Schultz. In a bifurcated proceeding, the same jury denied plaintiff's request for punitive damages. The trial judge awarded plaintiff $71,195 in attorneys' fees and $3,099.43 in costs.
On appeal plaintiff argues that the trial court erred in (1) dismissing his federal claims under § 1983 by finding that defendants were entitled to qualified immunity; (2) dismissing his state false arrest/false imprisonment claim because he failed to meet the TCA threshold for recovery; (3) barring plaintiff from testifying about receiving psychiatric treatment; (4) failing to respond to a jury question during the punitive phase of the trial; and (5) calculating the amount of counsel fees. Defendants' cross-appeal challenges the jury verdict.
We gather the following facts from the evidence presented at trial.

I

A
In the summer of 1997, the Saddle River Police Department spearheaded the creation of a multi-jurisdictional task force to combat a rash of residential burglaries that had been plaguing the community. The boroughs of Hillsdale and Ho-Ho-Kus and the Township of Washington were among the participating municipalities.[2] The task force consisted of forty police officers from the various participating municipalities.
*503 Sergeant Robert Breese of the Saddle River Police Department was assigned to the task force. According to Breese, the task force was designed to provide a rapid response to a report of a burglary by establishing a perimeter around Saddle River, "to try either [to] catch a vehicle going out or to catch a vehicle coming in," that the police believed was being used to pick up or drop off the burglars. The police did not have any information, however, as to the type of vehicle, if any, used by the burglars. In fact, police investigators had been unable to determine whether the burglaries were the product of a coordinated organized crime operation or a series of disjointed events.
On October 24, 1997, the Saddle River Police Department received reports of two burglaries. The first one occurred on Werimus Brook Road. It was discovered by the homeowner upon her return from work at 6:20 p.m. She had originally left her residence at 11:00 a.m. Therefore, there was no way of pinpointing when the burglary actually occurred. While investigating the first burglary, Breese was advised of a residential alarm sounding about one block away on Old Woods Road. The investigation by the police into both burglaries did not uncover any information as to the number or identity of the burglars, their means of conveyance, or the direction of their travel. This was made clear during Breese's cross-examination:
Q. Dealing with the two [burglaries] that took place on October 24th, '97, did you have any information, in fact, that they were perpetrated by the same people?
A. The two that happened that night?
Q. That's correct.
A. Did they?
Q. Did you have any way of knowing if they had been perpetrated by the same offender or offenders?
A. No.
Q. Did you have any way of knowing if they had been perpetrated by the people who were responsible for the burglaries you were investigating on other dates?
A. No.
Q. Did you have any way of knowing whether the burglary of either of them on October 24th, '97 were committed by one person or more than one person?
A. No.
Q. Did you have any way of knowing whether the person or persons who had committed the burglaries, either of them on October 24th, '97 were white, black, Hispanic, or otherwise?
A. No.
Q. Did you have any way of knowing if they were male or female?
A. No.
Q. Did you have any way of knowing whether they arrived by car or foot?
A. No.
Q. Did you have any way of knowing if they were leaving by car or foot?
A. No.
Q. Did you have any way of knowing what direction they were going in?
A. No.
Notwithstanding this informational void, Breese sent out a general-assistance call to all of the participating municipalities in an effort to seal the borders of Saddle River. The call included a request to the Rockland County Sheriff's Department to deploy its helicopter for the purpose of conducting air surveillance. The goal, according to Breese, was to "[watch] the borders of our town for anybody that might be walking later on."
At 8:05 p.m. on October 24, 1997, Sergeant Robert Orr of the Ho-Ho-Kus police department received a call from a resident *504 at Powder Horn Road that "a white van had pulled into [her] driveway andfor a short time, and it had pulled back out," leaving in the direction of Weramus Road. The caller could not provide any description of the van's occupants. Armed with this limited information, Orr alerted Washington Township Police Department "to be on the [lookout] for a white van." The alert also noted that "multiple burglaries had occurred in Saddle River prior to the report of the suspicious van."
In response to the call for general assistance from Saddle River, Hillsdale Police Officer Frank Novakowski and Washington Township Police Officer Robert LaBianca stationed themselves at the intersection of Mill Road and Chestnut Ridge Road, near the Ho-Ho-Kus border. At approximately 8:05 p.m., Novakowski and LaBianca received the "suspicious white van" alert and readied themselves to intercept it.

B
At around 7:30 p.m. on October 24, 1997, plaintiff, Alberto DelaCruz, a forty-five-year-old Filipino-American, had just completed working at the residence of a Saddle River physician installing air conditioning ducts. He was employed by Garden State Environmental as a heating and air conditioning laborer. That day he was part of a five-man crew consisting of himself, another Filipino, two Caucasians and an African-American. The company vehicle was a white panel van with windows in the back, a roof-rack on top and a sign on the side bearing the name: "Garden State Environmental." The men left the job site in the van. Plaintiff was the driver; two men sat in front, and because there were no seats, two sat on the floor in the back.
What happened as the van approached the intersection of Mill Road, Chestnut Ridge Road and Jacqueline Avenue was disputed at trial. However, because the Law Division dismissed plaintiff's claims pursuant to defendants' motion under R. 4:40-2(a), we will, for the purpose of our analysis here, accept as true all of the evidence supporting plaintiff's position and will accord him the benefit of all legitimate inferences which can be deduced there from. Estate of Roach v. TRW, Inc., 164 N.J. 598, 612, 754 A.2d 544 (2000) (citing Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969)).
According to plaintiff, he had driven a short distance when he was pulled over by police vehicles with the overhead lights flashing. It was stipulated by the parties at trial that the police did not observe plaintiff violate any motor vehicle laws when he was directed to pull over and that he immediately obeyed the instructions of the police to pull over and was at all times cooperative.
When his vehicle came to a stop, a police officer approached the side of the van, pointed a gun at him from approximately three feet away and ordered him out, directing him to open his window, raise his left hand, and open the door with his right hand. Plaintiff immediately and repeatedly inquired as to what he had done wrong. Without addressing plaintiff's questions or offering any explanation, the officer pointed his gun at plaintiff through the open vehicle door and ordered him to get out of the van referring to him as "Mother F___ er." A second police officer stood in front of the van.
Plaintiff was directed to walk backwards alongside the van. While complying, plaintiff offered his wallet and driving credentials. Plaintiff further offered a company invoice with the address of the home of the physician he had been working in, and asked the officer to call the house to verify his earlier whereabouts. According *505 to plaintiff, his request was ignored and the officers continued to curse at him.
At this point, Ho-Ho-Kus Police Officer Eugene Schultz arrived on the scene. Shultz was off-duty, in street clothes and unarmed. He had passed by the scene on his way to report to work when he stopped to offer assistance. According to plaintiff, he was ordered to kneel. As he attempted to comply, he was kind of "pushed." An officer then put his knees in plaintiff's back as he was handcuffing him. Although plaintiff could not see who handcuffed him, Novakowski testified that Schultz patted plaintiff for weapons and applied handcuffs behind his back. By this time, plaintiff was crying and begging the police to call the doctor to verify his whereabouts. His requests were consistently ignored.
Although plaintiff was unable to identify the police officers involved in the initial stop of the van, Novakowski's incident report identified Novakowski as the officer who stopped plaintiff's van at gunpoint, with LaBianca acting as his back-up at the scene. Novakowski also testified that LaBianca had his gun drawn and pointed at the van. Plaintiff remained facedown on the ground, in handcuffs, for approximately ten minutes.

C
When asked at trial to characterize his actions in removing plaintiff at gunpoint from the van, placing him facedown on the ground and handcuffing him behind his back for over ten minutes, Novakowski gave the following responses:
Q. As far as you were concerned, was this an arrest?
A. An arrest? No.
Q. What was it, as far as you were concerned?
A. We were detaining what we believed were suspects in the burglary.
Q. Do you, under ordinary circumstances, put somebody on the ground that you're only detaining but not arresting?
A. Under ordinary circumstances? If we believe there's reason for our safety or for the subject's safety, yes.
Q. Do you put somebody in handcuffs when you're not going to arrest them, just for detention purposes?
A. If we haven't determined yet if we're going to arrest somebody or if we believe there's any reason to believe we need to control the subject prior to that, then, yes, we would handcuff that person until we had made that determination, in order to insure our safety and his safety.
Novakowski also testified that: (1) he stopped plaintiff's van because he believed it was connected to the burglaries based exclusively on the radio transmission that a "suspicious white van" had been seen in the area of a recent burglary; (2) neither he, nor LaBianca nor Schultz ever asked plaintiff any questions as to his reasons for being in the area, or requested him to produce identification or motor vehicle credentials; and (3) he believed that his actions here did not violate, and were therefore in keeping with the practices, policies and procedures of the Hillsdale Police Department.
By contrast, Sergeant Orr testified that a proper stop under the circumstances presented here would have included a request for motor vehicle credentials and a possible frisk of the van's occupants. Handcuffing, however, would not take place without an arrest supported by probable cause. At the time of trial, Orr held the supervisory rank of sergeant and had been a police officer for twenty-seven years. Eighty percent of his time on the force involved road work.
*506 Plaintiff also called Patrolman Anthony Grego, an officer with approximately seven years experience at the time of trial. He had been involved in an estimated one thousand motor vehicle stops and had made between thirty to forty arrests in his career. Grego confirmed that handcuffing a suspect only occurs as an incident to arrest. The only exception noted by Grego involved a case in which an individual who refused to be taken to a psychiatric facility was handcuffed for his own safety.[3]
After plaintiff had been facedown on the ground with his hands cuffed behind his back for about ten minutes, Breese and a number of other police officers from neighboring municipalities arrived at the scene. By this time, plaintiff's co-workers had been removed from the van and were seated on the curb by the side of the road. Breese gave the following description of what transpired next:
I spoke to the gentleman [plaintiff] and determined that he was coming from [referring to an exact address], which is [referring to the doctor by name]'s house, Saddle River, and several nights prior to this night, during a routine patrol, I had seen that van and was aware that there was [sic] occupants, you know, or workers working at [referring to the same exact address] and I was satisfied that these were not the suspects that we were looking for.
....
Q. After recognizing them, the man on the ground and the others, as workers, what did you do?
A. I took Mr.this gentleman's handcuffs off. He had identified himself as Mr. DelaCruz, and I took his handcuffs off and walked him over to his van and he eventually wasgot in his van, the other workers got back in the van and they drove away.
D
Plaintiff testified that he experienced pain in his shoulder from being lifted by his arms by two police officers and pain in his back from being "kneed" when the police were handcuffing him. He did not seek medical treatment for three days. He was eventually treated in the emergency room of John F. Kennedy Medical Center and instructed not to work for three days. He made a full physical recovery within one week.
According to plaintiff, however, the emotional and psychological trauma caused by this experience continues to this day. He was unable to return to Garden State Environmental because he associated the events of October 24, 1997, with his job. He is extraordinarily nervous when he drives and has severe fear of the police. In the months after the incident he had great difficulty sleeping, experiencing both insomnia and nightmares. His relationship with his wife was negatively affected as well. His wife testified that plaintiff became emotionally detached and generally disinterested in participating in family activities. He also lost his desire to look for work. This affected the family's finances and added an economic dimension to an emotionally stressful situation.
Plaintiff was also treated by a psychiatrist in connection with this incident. He participated in an undisclosed number of psychiatric counseling sessions and was prescribed sleep medication. Because plaintiff chose not call the treating psychiatrist as a witness, the trial court barred him from testifying that he had seen a *507 psychiatrist and received the described treatment.

II
In dismissing plaintiff's federal claims under 42 U.S.C.A. § 1983, the Law Division ruled that all police officers involved were entitled to qualified immunity as a matter of law. As a consequence of this ruling, the court also dismissed plaintiff's claims against the municipal defendants.

Qualified Immunity
42 U.S.C.A. § 1983 provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]
It is now firmly established that in order to succeed in a § 1983 claim, plaintiff must make a prima facie showing that defendants, while acting under color of state law, deprived him of a clearly established constitutional or statutory right. Leopardi v. Township of Maple Shade, 363 N.J.Super. 313, 327, 832 A.2d 943 (App. Div.2003). Police officers discharging their law enforcement responsibilities act, by definition, under color of law. See Jiosi v. Township of Nutley, 332 N.J.Super. 169, 178, 753 A.2d 132 (App.Div.2000).
There is no question here that plaintiff established a prima facie case under § 1983. The police officers acted under color of state law and according to plaintiff, deprived him of his constitutional rights by: (1) stopping his vehicle; (2) removing him at gunpoint; and (3) physically compelling him to lie on the ground handcuffed for over ten minutes.
The affirmative defense of qualified immunity entitles police officers being sued under § 1983 to immunity from civil prosecution if they can successfully prove: (1) that they acted with probable cause; or, (2) even if probable cause did not exist, that a reasonable police officer could have believed in its existence. Schneider v. Simonini, 163 N.J. 336, 355, 749 A.2d 336 (2000), cert. denied, 531 U.S. 1146, 121 S.Ct. 1083, 148 L. Ed.2d 959 (2001); Wildoner v. Borough of Ramsey, 162 N.J. 375, 385-86, 744 A.2d 1146 (2000).
The trial court found that Novakowski and LaBianca did not have probable cause when they stopped plaintiff's van, ordered him out at gunpoint and placed him on the ground handcuffed. We agree. "`Probable cause exists if at the time of the police action there is a well grounded suspicion that a crime has been or is being committed.'" State v. Dangerfield, 171 N.J. 446, 456, 795 A.2d 250 (2002) (quoting State v. Sullivan, 169 N.J. 204, 211, 777 A.2d 60 (2001) (internal quotation marks omitted)). This standard requires a police officer to make "`a practical, common-sense decision whether, given all the circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" State v. Demeter, 124 N.J. 374, 380-81, 590 A.2d 1179 (1991) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L. Ed.2d 527, 548 (1983)).
The only information available to Novakowski and LaBianca as they encountered plaintiff's vehicle was that a "suspicious white van" was seen in the vicinity of a recently reported burglary. No information was relayed to the officers that the "suspicious van" or its occupants were connected with this or any of the prior burglaries. If such limited information amounted *508 to probable cause, then a police officer would be authorized to arrest the occupants of every white van passing through his or her checkpoint. Such a wide-net approach to law enforcement would eviscerate the individualized suspicion requirement which is at the heart of the protections afforded by the Fourth Amendment.
However, as noted earlier, even in the absence of probable cause, Novakowski and LaBianca are entitled to assert the defense of qualified immunity if they reasonably believed that probable cause existed. The test here is an objective one. It is not legally sufficient for Novakowski and LaBianca to subjectively or even honestly believe that the facts, as they knew them, conferred upon them the legal authority to act as they did here. Successful assertion of the defense of qualified immunity requires defendants to establish that a reasonably competent police officer receiving the same information would have concluded that probable cause existed. Kirk v. City of Newark, 109 N.J. 173, 184, 536 A.2d 229 (1988). Thus, qualified immunity does not protect police officers who are "plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L. Ed.2d 271, 278 (1986).
An analysis of this issue requires that we breakdown plaintiff's encounter with the police into two phases: (1) investigatory and (2) confiscatory.

Investigatory Phase
An investigatory stop occurs "when the police act in such a way that a reasonable person would believe that he or she is not free to leave." State v. Citarella, 154 N.J. 272, 280, 712 A.2d 1096 (1998). In order to justify an investigatory stop, a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." State v. Nishina, 175 N.J. 502, 510-11, 816 A.2d 153 (2003) (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)); See also State v. Golotta, 178 N.J. 205, 212-13, 837 A.2d 359 (2003); State in the Interest of C.B., 315 N.J.Super. 567, 573, 719 A.2d 206 (App. Div.1998).
The concept of reasonable suspicion involves a
[l]ess demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

[State v. Stovall, 170 N.J. 346, 363, 788 A.2d 746 (2002) (quoting Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L. Ed.2d 301, 309 (1990)).]
Ultimately, whether the police had reasonable suspicion to conduct an investigatory stop of a citizen depends upon the totality of the circumstances known to the individual officer at the time. Alabama v. White, supra, 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309; State v. Valentine, 134 N.J. 536, 546, 636 A.2d 505 (1994).
Here, Novakowski and LaBianca were deployed as part of a multi-jurisdictional task force created to investigate and combat a series of residential burglaries. Although no information was known about the identity of the burglars or the means of transportation used in perpetrating the crimes, in light of the recently reported burglaries, a call to authorities about a suspicious white van in the area warranted further investigation.
*509 Under these circumstances, we are satisfied that the police had reasonable suspicion to conduct a limited investigatory stop of plaintiff's van as it passed through the location where Novakowski and LaBianca were stationed. This stop could have included asking plaintiff for identification and motor vehicle credentials and inquiring as to his reasons for being in the area. State v. Pegeese, 351 N.J.Super. 25, 31, 796 A.2d 934 (App.Div.2002). Unless plaintiff's conduct or the conduct of the van's other occupants provided reasonable grounds for further involvement, the actions of the police should have promptly ended at this point.

Confiscatory Phase
In State v. Dickey, 152 N.J. 468, 476, 706 A.2d 180 (1998), our Supreme Court applied the two-part test from Terry v. Ohio to determine the reasonableness of a detention following a valid motor vehicle stop. We must first determine "whether the officer's action was justified at its inception." If the answer to this initial question is "yes," then we must determine "whether [the action of the police] was reasonably related in scope to the circumstances which justified the interference in the first place." Ibid. (quoting Terry v. Ohio, supra, 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905). Thus, a citizen's interaction with the police in an investigatory stop must be "brief and narrowly circumscribed" and involve a "`wholly different kind of intrusion upon individual freedom' than a traditional arrest." State v. Dickey, supra, 152 N.J. at 477, 706 A.2d 180 (quoting Terry v. Ohio, supra, 392 U.S. at 26, 88 S.Ct. at 1882, 20 L.Ed.2d at 909). An investigatory stop becomes a de facto arrest when the conduct of the police disregards these limitations and needlessly intrudes upon a citizen's right to privacy and freedom. State v. Dickey, supra, 152 N.J. at 478, 706 A.2d 180; State v. Hampton, 333 N.J.Super. 19, 31-32, 754 A.2d 567 (App.Div.2000).
Here, we can see no legal justification for converting what should have been an innocuous five-minute investigatory stop into a de facto arrest, carried out in an excessively confrontational and abusive manner. Convinced that they had come upon the serial burglars, Novakowski and LaBianca prejudged the encounter with plaintiff from its inception. Their actions in removing plaintiff from the van at gunpoint, physically forcing him facedown to the ground and keeping him handcuffed for over ten minutes, were factually unwarranted and legally untenable. Under these circumstances, these defendants were not entitled to assert the defense of qualified immunity.

III

The Tort Claims Act
Among the reasons cited by the Law Division for dismissing plaintiff's false arrest/false imprisonment claims was his failure to vault the verbal threshold in N.J.S.A. 59:9-2(d). This section of the TCA provides in relevant part:
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.
Here, it is undisputed that plaintiff cannot meet the requirements of this statute. We hold, however, that in adopting N.J.S.A. 59:3-3, the Legislature intended to relieve persons prosecuting civil claims for false arrest/false imprisonment from having to meet the requirements of N.J.S.A. 59:9-2(d). *510 We reach this conclusion based both on the nature of the tort of false arrest/false imprisonment itself, as well as on the language and legislative history of N.J.S.A. 59:3-3.
N.J.S.A. 59:3-3 provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment." (Emphasis added). "[F]urtherance of legislative purpose is the key to [interpreting a statute]." GE Solid State, Inc. v. Director, Div. of Taxation, 132 N.J. 298, 308, 625 A.2d 468 (1993). Legislative intent can be derived from both the actual text in the statute and the objectives sought to be achieved. Foxworth v. Morris, 134 N.J. 284, 288, 633 A.2d 536 (1993). The legislative history, as reflected in the comment to the statute, provides a clear insight into what the Legislature intended when it adopted N.J.S.A. 59:3-3:
The immunity provided by this section is similar to provisions contained in the California Tort Claims Act, § 820.4, the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and other statutes throughout the country. This section does not, however, immunize law enforcement officials from false arrest and false imprisonment. It is recognized that law enforcement officers are not now immune in the State of New Jersey and it is believed that existing principles of law provide sufficient protection for the officer from frivolous suits. Therefore it is the intent of this section to emphasize the importance of compensating a citizen whose freedom has been unreasonably restricted.

[Report of the Attorney General's Task Force on Sovereign Immunity 216-17 (1972) (emphasis added).]
In our view, this language supports our conclusion that plaintiff's loss of freedom is legally compensable notwithstanding the absence of any physical, psychological or emotional harm. The TCA was adopted in 1972. As the comment cited above indicates, the Legislature was aware that the case law predating its passage did not immunize law enforcement officers from civil liability based on false arrest.
In 1953, our Supreme Court declared: "Now, as to false arrest it has been repeatedly held in this State and elsewhere that the use of physical force is not altogether necessary. The essential thing is the constraint of the person." Earl v. Winne, 14 N.J. 119, 127, 101 A.2d 535 (1953). (Emphasis added). Thus, as we will demonstrate, the application of the physical harm requirements in N.J.S.A. 59:9-2(d) would frustrate the Legislature's unambiguous intent to compensate "a citizen whose freedom has been unreasonably restricted."
We are aware that our analysis and conclusions here are at odds with the holding in Marion v. Borough of Manasquan, supra, 231 N.J.Super. 320, 555 A.2d 699. We thus respectfully part company from our distinguished colleagues on this issue. We do so mindful of the words of Judge Stern that, "an appeal to this court should not turn on the Part or judges to which the matter is assigned ... However, each judge must decide an issue as he or she believes appropriate after giving due deference to any precedent available." Hellwig v. J.F. Rast & Co., Inc., 215 N.J.Super. 247, 254, 521 A.2d 896 (App.Div.1987) (Stern, J.A.D., concurring) certif. granted, 107 N.J. 636, 527 A.2d 459 (1987), aff'd, 110 N.J. 37, 538 A.2d 1243 (1988).
In Marion the plaintiffs were arrested, but not handcuffed, transported in a police car and placed in a municipal cell for approximately two hours for violating a municipal *511 ordinance requiring people on the beach walk in bathing attire to purchase beach badges. Marion v. Borough of Manasquan, supra, 231 N.J.Super. at 323-24, 555 A.2d 699. Because the emotional distress experienced by these plaintiffs as a direct result of their unlawful detention did not also cause any physical symptoms nor require medical or psychiatric treatment, the Marion court held that their false arrest/false imprisonment claim was barred by N.J.S.A. 59:9-2(d). Id. at 332, 555 A.2d 699.
In reaching this conclusion, the Marion court relied upon a line of cases which had denied pain and suffering damages arising from emotional distress in factual settings not involving false arrest. See Ayers v. Township of Jackson, 106 N.J. 557, 576, 525 A.2d 287 (1987) (plaintiffs sought emotional distress damages after lengthy exposure to contaminated drinking water); Acevedo v. County of Essex, 207 N.J.Super. 579, 588, 504 A.2d 813 (Law Div.1985) (father sought emotional distress damages based upon his alleged viewing of son's body after it had been exhumed); Dlugosz v. Fred S. James & Co., 212 N.J.Super. 175, 185, 514 A.2d 538 (Law Div.1986), overruled by Brook v. April, 294 N.J.Super. 90, 682 A.2d 744 (App.Div.1996) (former police officer sought emotional distress damages based upon wrongful discharge in violation of prohibition against discrimination for seeking workers' compensation benefits); Mercado v. State, 212 N.J.Super. 487, 493-494, 515 A.2d 804 (Law Div.1985) (parents sought emotional distress damages resulting from distress, anxiety, and embarrassment stemming from placement of their two children in foster home). We believe that by relying on a line of cases which did not involve the tort of false arrest/false imprisonment to support its holding, the Marion court failed to fully appreciate the unique nature of the injury involved in this type of tort.
We are also aware that in Collins v. Union County Jail, 150 N.J. 407, 415, 696 A.2d 625 (1997), the Supreme Court distinguished, but did not reverse, the holding in Marion when it held that N.J.S.A. 59:9-2(d) did not bar recovery for psychological and emotional trauma suffered by a prisoner who was sexually assaulted by a corrections officer, even though he did not sustain residual physical injury. However, the Court in Collins was not required to apply the TCA threshold to a claim of false arrest/false imprisonment. Thus, we are not precluded from examining the issue here.
The applicability of the TCA threshold to the tort of false arrest/false imprisonment implicitly resurfaced in Leopardi v. Township of Maple Shade, supra, 363 N.J.Super. at 332-33, 832 A.2d 943. However, because the plaintiff in Leopardi sustained permanent back and neck injuries sufficient to vault the threshold, the court never addressed the questions we confront here. Id. at 334, 832 A.2d 943. The injuries sustained by the plaintiff in Leopardi were not caused by the arrest itself, but by the excessive force used in carrying out the arrest. Id. at 324-25, 832 A.2d 943.

False Arrest/False Imprisonment
False arrest and false imprisonment are different names for the same tort. Price v. Phillips, 90 N.J.Super. 480, 484, 218 A.2d 167 (App.Div.1966). The tort of false imprisonment is complete when one unlawfully detains another. "`The gist of false imprisonment is mere unlawful detention without more.'" Lakutis v. Greenwood, 9 N.J. 101, 106, 87 A.2d 23 (1952) (quoting Altana v. McCabe, 132 N.J.L. 12, 13, 38 A.2d 192 (Sup.Ct.1944)). False imprisonment is a civil wrong similar to assault and battery in that "[it] consists *512 in imposing, by force or threats, unlawful restraint upon a man's freedom of locomotion." Earl v. Winne, supra, 14 N.J. at 128, 101 A.2d 535. Police officers and other public officials may be held liable for false imprisonment where they have acted outside their authority. Lakutis v. Greenwood, supra, 9 N.J. at 106, 87 A.2d 23.
"False arrest, [like] false imprisonment, is the constraint of a person without legal justification." Mesgleski v. Oraboni, 330 N.J.Super. 10, 24, 748 A.2d 1130 (App.Div.2000). "A [legal] basis for a suit for false arrest arises where the aggrieved party is arrested without legal authority...." Ibid. An unlawful arrest cannot be legalized by subsequent events. Bauer v. Borough of Cliffside Park, 225 N.J.Super. 38, 47, 541 A.2d 719 (App.Div.), certif. denied, 113 N.J. 330, 550 A.2d 447 (1988).
One who is wrongfully deprived of freedom does not necessarily suffer from a denial of the necessities for maintaining a physical existence. Nor can the signs of unlawful confinement be detected by conducting a physical examination of the victim. As noted by the Supreme Court of California in Sullivan v. County of Los Angeles, 12 Cal.3d 710, 117 Cal.Rptr. 241, 527 P.2d 865, 868 (1974), "[i]n a false imprisonment case, the `injury' suffered by an individual is the illegal confinement itself rather than any detriment occurring after imprisonment...." One who is wrongfully deprived of freedom sustains an intangible injury, the magnitude of which cannot be measured or assessed in physical terms. Although this injury may, in some cases, also cause psychological or emotional trauma, a victim of false arrest/false imprisonment need not experience such trauma to have a legally compensable claim.
In a free society, a citizen has the right to move about, unburdened by unreasonable governmental restrictions. A deprivation of this right is rendered legally compensable when it results from the unlawful acts of government agents such as police officers. To conclude otherwise would convert this civil right into an empty promise.
Consider a case where a person is unlawfully detained by the police, not for ten minutes as in this case, but for several days. He is not physically mistreated during his incarceration and is eventually released physically unharmed. Is he to be left without legal compensation? Did the Legislature intend to leave this obvious wrong without a remedy? Is the public policy of deterrence embodied in the tort of false arrest/false imprisonment furthered by imposing a legal requirement that renders any potential claim a nullity? We believe the answer to all three of these questions is "no."
We thus hold that a plaintiff asserting a false arrest/false imprisonment claim need only prove that he or she was wrongfully deprived of freedom. The length of the unlawful confinement is relevant only to a determination of damages, not as an element of proof of liability. See State v. Dickey, supra, 152 N.J. at 475, 706 A.2d 180. Here, plaintiff established all of the elements necessary to prevail on his claim.

IV
We have previously concluded that defendants Novakowski and LaBianca were not entitled to assert the defense of qualified immunity. However, these defendants are still entitled to raise their subjective good faith as a second line of defense to plaintiff's federal claims under § 1983. Fielder v. Stonack, 141 N.J. 101, 132, 661 A.2d 231 (1995); Leopardi *513 v. Township of Maple Shade, supra, 363 N.J.Super. at 332, 832 A.2d 943.
As to plaintiff's state claims, N.J.S.A. 59:3-3 specifically disallows the so-called "good faith" defense for claims based on false arrest/false imprisonment. Hayes v. County of Mercer, 217 N.J.Super. 614, 622, 526 A.2d 737 (App. Div.), certif. denied, 108 N.J. 643, 532 A.2d 226, (1987). Thus, given the undisputed facts here, that is: (1) plaintiff was directed by the police to exit his vehicle at gunpoint, forced to lay on the ground facedown, handcuffed and kept in this position for ten minutes; and (2) the police lacked the legal authority to do so, plaintiff is entitled to judgment on liability on false arrest/false imprisonment as a matter of law.
Furthermore, unlike § 1983 claims,[4] the municipal employers of defendants Novakowski and LaBianca are vicariously liable for their conduct under the doctrine of respondeat superior. N.J.S.A. 59:2-2; McAndrew v. Mularchuk, 33 N.J. 172, 195, 162 A.2d 820 (1960); O'Brien v. Borough of Woodbury Heights, 679 F.Supp. 429, 439 (D.N.J.1988). All defendants, including Novakowski's and LaBianca's municipal employers, were represented by the same counsel who presented a joint defense. No argument was made at trial or in this appeal, that these police officers acted outside the scope of their employment when they confronted plaintiff on October 24, 1997.
As to Schultz, we agree with the trial judge that, having arrived at the scene while events were in progress, he was not legally required to independently ascertain the legal basis for detaining plaintiff, and thus cannot be held legally liable for Novakowski's and LaBianca's actions. He is, of course, liable for his own use of excessive force against plaintiff. We see no legal basis to disturb the jury's verdict in this respect.

V
Plaintiff's argument challenging the amount of counsel fees awarded by the trial court is moot. The Law Division shall determine the amount of counsel fees plaintiff's counsel is entitled to receive after the trial on damages is concluded. The balance of plaintiff's arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
We remand the matter to the Law Division for trial as to plaintiff's § 1983 claims. We remand for the entry of judgment as to liability on plaintiff's state claim of false arrest/false imprisonment and for trial on the question of damages. To the extent that the legal basis for an award of damages under the federal and state claims may overlap, the trial court should so instruct the jury. That is, although plaintiff is entitled to pursue his legal claims under both theories of liability, the amount of damages should only reflect compensation for the event which occurred on October 24, 1997.
Reversed and remanded.
NOTES
[1] Although Lenita DelaCruz is also a named plaintiff, we will only refer to "plaintiff" in the singular since her claims are derivative.
[2] Other participating municipalities included Woodcliff Lake, Warwick, Allendale, Mahwah and Ridgewood. The Bergen County Prosecutor's Office and the Federal Bureau of Investigation also provided technical and investigatory support.
[3] The deposition testimonies of police officers Orr and Grego were read to the jury by plaintiff's counsel in lieu of actually calling these witnesses at trial.
[4] There is no vicarious liability under 42 U.S.C.A. § 1983. City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412, 424 (1989).