832 A.2d 943

DOMINIC LEOPARDI, PLAINTIFF–APPELLANT, AND JUDITH LEOPARDI, PLAINTIFF, v. TOWNSHIP OF MAPLE SHADE, COUNTY OF BURLINGTON, BURLINGTON COUNTY PROSECUTOR'S OFFICE, WILLIAM MCGOVERN, MICHAEL ANYZEK, STEVE CARBONE, MEDFORD LAKES POLICE DEPARTMENT AND BOROUGH OF MEDFORD LAKES, DEFENDANTS–RESPONDENTS, AND STATE OF NEW JERSEY, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued September 10, 2003—Decided October 14, 2003.

316

Before Judges KING, LINTNER and LISA.

*Albert M. Stark* argued the cause for appellant (*Stark & Stark*, attorneys; *Albert M. Stark*, of counsel and on the brief).

*Michael O. Kassak* argued the cause for respondents Medford Lakes Police Department, Borough of Medford Lakes, and Steve Carbone (*White & Williams*, attorneys; *Mr. Kassak*, of counsel and on the brief).

*Stacy L. Moore, Jr.,* argued the cause for respondents County of Burlington, Burlington County Prosecutor's Office, and William McGovern (*Parker, McCay & Criscuolo*, attorneys; *Mr. Moore*, of counsel and on the brief).

*Harris & Greenberg*, attorneys for respondents Township of Maple Shade and Michael Anyzek, join in the brief filed on behalf of respondents County of Burlington, Burlington County Prosecutor's Office, and William McGovern.

The opinion of the court was delivered by

LINTNER, J.A.D.

On August 30, 1999, plaintiffs, Dominic and Judith Leopardi, husband and wife, filed a complaint against defendants Township of Maple Shade (Maple Shade), County of Burlington (Burlington), Burlington County Prosecutor's Office (Prosecutor's Office), State of New Jersey (State), Borough of Medford Lakes and Medford Lakes Police Department (Medford Lakes), as well as individual police officers William McGovern, Michael Anyzek, and Steve Carbone, seeking damages as a result of events occurring on June 11, 1998, when plaintiff was mistakenly arrested for soliciting prostitution. The complaint pled various state law claims under the Tort Claims Act, federal claims under 42 *U.S.C.A.* § 1983, negligent hiring, and claims against the State, County, and municipalities, and a per quod claim.[1] Plaintiff appeals from an order granting summary judgment dismissing his complaint against police officers William McGovern, Michael Anyzek, and Steve Carbone. We reverse and remand the matter for trial.

Because this appeal arises from the grant of motions for summary judgment, "we must view the facts that may be inferred from the pleadings and discovery in the light most favorable to plaintiff[ ]." *Strawn v. Canuso*, 140 *N.J.* 43, 48, 657 *A.*2d 420 (1995). On June 11, 1998, the Prosecutor's Office organized a "sting" operation to crack down on the solicitation of prostitution in Maple Shade. The operation was organized as follows: there were undercover officers disguised as prostitutes wearing on-body transmitters that were monitored by a "back-up" team at the command post. Once a transaction was completed, the back-up team would radio an "arrest" team, who could not hear the conversation from the on-body transmitter, to arrest the offender. Approximately thirty law enforcement officers from the Prosecu-

---

[1] Judith Leopardi's claim for per quod damages and the claims against the State, County, Maple Shade, Medford Lakes, and Medford Lakes police department, have been dismissed and are not the subject matter of this appeal. We therefore address only Dominic Leopardi's claims against the individual police officers.

tor's Office and several Burlington County municipalities, including Medford Lakes and Maple Shade, participated in the operation.

Officer Michael Anyzek of the Maple Shade Police Department was assigned to an arrest team with Steve Carbone, who was regularly employed by the Medford Lakes Police Department but assigned to the Prosecutor's Office, and Detective William McGovern of the Prosecutor's Office. The team was stationed in an unmarked car in a parking lot near the intersection of Routes 73 and 38. Anyzek was in the driver's seat and McGovern was in the front passenger seat. Carbone was lying down in the back seat so as not to be conspicuous. The team could see the undercover officers negotiating with potential customers but could not hear what was said over the on-body transmitters.

At approximately 12:11 p.m., a transmission was relayed to Anyzek's arrest team. The content of the message, however, is unclear. The investigation report indicates that the undercover officer was "in conversation with [the] occupant of [a] black Mercedes Benz. Registration TRHEEL." Although all three officers testified that they were having difficulty deciphering transmissions over the radio, Anyzek testified that the transmission indicated that the suspect was "a white male" in a "blue Mercedes with dealer tags." Carbone testified that the transmission directed them to stop "a dark colored Mercedes with an older white male driver." He also indicated that there was more information relayed that he could not hear because of his position in the car. McGovern, on the other hand, denied that the transmission described a "black Mercedes with the license plate True Wheels" or the driver's race.

Nevertheless, after receiving the message, Anyzek proceeded onto Route 73 in pursuit of the suspect but lost sight of the vehicle. A short distance down the road, the team sighted a dark-colored Mercedes driven by plaintiff, which they believed to be the car they were pursuing. Anyzek activated the car's light on the dashboard and the Mercedes pulled over to the shoulder. Plain-

tiff's Mercedes, a black 190E, had its metal license plate in the rear window rather than the normal place. At oral argument on appeal, defendants conceded that the plate was not a dealer's plate. Plaintiff, who was employed in the automobile business, thought that he was being stopped for having an improperly displayed plate.

According to plaintiff, all three officers approached with their guns drawn and pointed at him.[2] Carbone, who was wearing a shirt that said "POLICE" on it, approached the driver's side door, while McGovern, wearing a bulletproof vest with his badge in the middle over a red pullover, approached the passenger side of the vehicle. Anyzek approached the back of the vehicle.

Plaintiff, who suffered from a heart condition, testified that McGovern repeatedly "screamed" at him to keep his hands on the steering wheel, causing him to urinate and defecate in his pants. Carbone opened the driver's side door and, without telling plaintiff to get out of the car, grabbed plaintiff by the shirt and "took" him out of the car. Plaintiff did not resist the force used to remove him from the vehicle but "made it as easy as possible because [he] was very, very upset and very scared."

McGovern handcuffed plaintiff's hands behind his back very tightly causing pain in his wrist and back. Plaintiff requested that the officers loosen his handcuffs, but they declined to do so. After plaintiff was secured, Carbone drove plaintiff's car to the command post. Meanwhile, plaintiff was placed in the back seat of the police vehicle, where he was joined by McGovern. Anyzek returned to the driver's seat. Plaintiff repeatedly told the officers that he did not feel well and asked them what he had done and to call an ambulance. Plaintiff testified that the officers did not respond. He also claimed that McGovern told him to "shut your

---

[2] Anyzek claimed that both Carbone and McGovern had their guns drawn. McGovern conceded that he had his gun drawn and pointed at defendant but does not recall whether the other officers did the same. Carbone denied having his gun drawn and did not recall whether or not the officers had their guns.

f——ing mouth; we deal with assholes like you all the time." Eventually, plaintiff was informed of the reason for his arrest while they were in route to the command post. When plaintiff responded that they had the wrong person, McGovern stated "all you guys say the same f——ing thing, we have the wrong person." According to plaintiff, the officers in the car told him that his name would be reported to the papers and they were going to ruin his reputation.

The officers' version was significantly different. Carbone testified that he immediately told plaintiff why he was being arrested and that plaintiff exited the car on his own. All the officers deny that plaintiff was called derogatory names, and none could recall plaintiff notifying them that he felt sick or asking for an ambulance. They all deny plaintiff asking them to loosen his handcuffs.

Notwithstanding the different versions, all defendants concede that plaintiff was compliant and fully cooperative during the entire time these events unfolded. Moreover, none of the officers asked plaintiff for his driver's license or registration. It was also admitted that during the ride to the command post, McGovern asked Anyzek whether they still publish the names of individuals who solicit prostitutes in the newspaper, and Anyzek replied that they did.

Based upon plaintiff's responses and the fact that they lost sight of the suspect's car, McGovern and Anyzek became "concerned, that plaintiff was not the right person as they drove back to the command post." After arriving at the command post, plaintiff was taken to see an officer who filled out an arrest report after which he was placed in a van with the other suspects who had been arrested. McGovern immediately informed one of the officers from the Prosecutor's Office "that this guy says he's the wrong guy, and we got to check this out." According to McGovern, after being told to return to their stakeout, the officers could hear a radio communication to them stating that the Mercedes that they were originally pursuing was "still driving around; is anybody going to get that car?"

The undercover officer was taken to the command post where she viewed plaintiff and indicated that he was not the person who solicited her. The handcuffs were removed and one of the officers asked plaintiff if he wanted them to call an ambulance. Plaintiff responded, "I want to get out of here." Plaintiff however was persuaded to wait for medical assistance. There was no ambulance available so they had him sit in the front seat of a station wagon. Plaintiff describes the scene as follows: "they brought ... [a] red and white station wagon with a very elderly gentleman to the scene.... [The elderly gentleman] took my blood pressure [which] was very high .... 200 over [something]." During the time he remained in the station wagon a Mercedes Benz 300E with the vanity license plate "TRUWHEELS" was pulled into the command post and the suspect was positively identified by the undercover officer.

It is unclear how long plaintiff was in custody. Plaintiff estimates that two hours elapsed from the time he was arrested until the time he left. McGovern was not present when plaintiff left, however, he estimated that approximately ten minutes elapsed from the time plaintiff was arrested until the time he was identified by the undercover officer.

While driving home, plaintiff "had the most incredible headache" and "felt very, very stiff" in his arm, back, and legs. He also had a pain in his stomach and his right wrist and hand were numb. At approximately 9:15 p.m., plaintiff reported to Robert Wood Johnson University Hospital in Hamilton complaining of tightness in his chest and headaches. His blood pressure was elevated and he was monitored until it came down. Plaintiff was discharged at 11:15 p.m.

In June 1998, plaintiff sought treatment from John Charuk, a psychologist. Plaintiff complained of various symptoms, including indecisiveness, lack of sleep, anxiety, stress, and depression. Charuk diagnosed plaintiff with "acute post-traumatic stress disorder ... manifested by constant anxiety and hypervigilance as well as panic attacks particularly when he [sees] police cars," which he

causally connected to the June 11, 1998 encounter with the police. Dr. Grusso, a consulting psychiatrist, mirrored Charuk's diagnosis of posttraumatic stress disorder, prescribed medication, and opined that plaintiff's prognosis was "[e]xtremely guarded to poor."

On September 10, 1998, plaintiff was examined by Dr. Rueben Hoppenstein, a neurosurgeon, who diagnosed plaintiff with herniated discs at C4–5 and C5–6 and a possible herniated disc at L4–5. Hoppenstein reported that plaintiff had been involved in an automobile accident in November 1997 where he sustained a knee injury requiring surgery and complained of pain in his neck and shoulders but no lumbar pain.

A CT scan of the lumbar spine ordered by Hoppenstein showed a left lateral herniation at L4–5 and considerable degenerative disease in the lower back at L3–4 and L5–S1 with foraminal stenosis. A cervical MRI revealed degenerative disease at C4–5 and C5–6 with bilateral foraminal stenosis and cord compression. On December 7, 1998, plaintiff underwent cervical discectomies at C4–5 and C5–6, which alleviated his neck pain. On June 19, 2000, plaintiff underwent a decompressive lumbar laminectomy with foraminotomies and posterior lumbar interbody fusions of C3–4, C4–5, and C5–S1. Upon discharge, plaintiff was fitted with a rigid bivalve brace.

On September 21, 2000, Hoppenstein rendered a report with the following conclusions:

It is my opinion, based on a reasonable degree of medical certainty that [plaintiff] definitely had a pre-existing condition in that he had degenerative disease of his spine both in his neck and his lower back. The fact that the three neurological examinations showed a marked deterioration after the arrest on June 11, 1998, pertaining to his neck and upper extremities makes one believe that this episode obviously contributed to his deterioration. The fact that he never complained of deteriorating lower back problems, although initially he did say he had some lower back pain, he never complained of his lower back when he went to see his neurologist. The osteophytes which were obviously evident from plain x-rays and the studies in both his neck and his back obviously took several years to develop and in all probability were present at the time of his motor vehicle accident and also at the time of his arrest. The causal relationship is that pulling somebody out of a car would no doubt stretch his nerves through these foramina that are already

stenotic and with the ensuing swelling would further cause pain and deterioration. The fact that his arms were cuffed behind his back is also a position of maximum stretch of his brachial plexus causing again pulling of these nerve roots through the foramina again causing swelling and because the foramina were so tight, there was no room for the swelling to abate and would cause further deterioration.

. . . .

As to his lumbar symptomatology and pathology, though there was a pre-existing condition, this roughing up of [plaintiff] again caused these nerves to be stretched through these tight foramina and resulting in his deterioration to the extent that he developed weakness and severe pain necessitating surgery. . . .

The fact that [plaintiff] now has three vertebrae fused in his neck and three in his lower back will be permanent and that there will be decreased mobility in both his neck and lower back. This makes him more susceptible to having damage to the discs above and below fusions as these cause stress on those discs. There is a high incidence of such people needing repeat surgery in 5 to 10 years after having had these fusions.

In conclusion, it is my opinion based on a reasonable degree of medical certainty that [plaintiff's] lower back surgery resulted from his rough handling when he was arrested while the trauma to his neck was probably the last straw that caused additional deterioration and brought him to surgery.

On February 8, 2001, Dr. William Simon, an orthopedic surgeon retained by Medford Lakes, conducted a complete orthopedic evaluation of plaintiff. Simon disputes Hoppenstein's findings of causal relations and permanency.

Against this factual backdrop the motion judge dismissed the Section 1983 claim that defendants lacked probable cause to stop and arrest plaintiff, finding that they were entitled to qualified immunity because it was not clearly established that reasonably competent officers with the same information would have concluded that probable cause to stop and arrest plaintiff did not exist. Applying the concept of qualified immunity to plaintiff's Fourth Amendment claim against the use of excessive force, the judge found that the facts, when viewed most favorably to plaintiff, from the perspective of the arresting officers, were not objectively unreasonable. Finally, the judge found that plaintiff's injuries did not satisfy the New Jersey Tort Claims Act threshold, *N.J.S.A.* 59:9–2d, and that defendants were entitled to immunity under *N.J.S.A.* 5:3–3 because the factual circumstances surrounding plaintiff's arrest failed to establish that the officer's acted in less than an objectively reasonable manner.

 We first examine the principles underlying qualified immunity as they apply to Section 1983 claims based upon lack of probable cause and excessive force. Section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States .. to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

[42 *U.S.C.A.* § 1983]

Thus, to succeed in a Section 1983 claim, plaintiff must establish a prima facie showing that defendant, acting under color of state law, deprived plaintiff of a constitutional right. *Curley v. Klem*, 298 *F.*3d 271, 277 (3 Cir.2002). Section 1983 does not create any substantive right but provides a remedy for violations of the United States Constitution or other federal laws. *Kneipp v. Tedder*, 95 *F.*3d 1199, 1204 (3d Cir.1996). Potentially liable parties, however, are entitled to qualified immunity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 *U.S.* 800, 818, 102 *S.Ct.* 2727, 2738, 73 *L.Ed.*2d 396, 410 (1982). Because qualified immunity involves immunity from suit rather than a mere defense to liability, a ruling on the issue should take place as early in the proceedings as possible. *Saucier v. Katz*, 533 *U.S.* 194, 200–01, 121 *S.Ct.* 2151, 2156, 150 *L.Ed.*2d 272, 281 (2001); *Wildoner v. Borough of Ramsey*, 162 *N.J.* 375, 387, 744 *A.*2d 1146 (2000) ("[E]ntitlement to qualified immunity is a question of law to be decided [as] early in the proceedings as possible, preferably on a properly supported motion for summary judgment or dismissal.").

 Qualified immunity claims involve a two-step analysis. First, the court must consider whether, "[t]aken in the light most favorable to the party asserting the injury ... the facts alleged show that the officer's conduct violated a constitutional right." *Saucier, supra,* 533 *U.S.* at 201, 121 *S.Ct.* 2151. If there is no constitutional violation established, then the inquiry is at an end. *Ibid.* Where a constitutionally established violation can be made

out on a favorable view of the plaintiff's submissions, the next question to be decided is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronting the officer. *Bennett v. Murphy*, 274 *F*.3d 133, 136 (3d Cir.2002); *Saucier, supra*, 533 *U.S.* at 201, 121 *S.Ct.* 2151. This second step "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Ibid.* Under the factual circumstances alleged by plaintiff, the question to be resolved is would a reasonable officer have understood that his actions were prohibited. "The focus ... is solely upon the law. If it would not have been clear to a reasonable officer what the law required under the facts alleged, he is entitled to qualified immunity. If the requirements of the law would have been clear, the officer must stand trial." *Bennett v. Murphy*, 274 *F*.3d 133, 136–37 (3d Cir.2002).

 Section 1983 "operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Saucier, supra*, 533 *U.S.* at 206, 121 *S.Ct.* 2151; *see also Wildoner, supra*, 162 *N.J.* at 385, 744 *A*.2d 1146. The crucial inquiry on summary judgment is "what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards." *Saucier, supra*, 533 *U.S.* at 208, 121 *S.Ct.* 2151. Thus, an officer is entitled to immunity even if he exercises his powers under a mistaken belief so long as the mistake when viewed in light of the facts asserted by plaintiff was objectively reasonable. "[T]he defense of qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Wildoner, supra*, 162 *N.J.* at 386, 744 *A*.2d 1146 (quoting *Malley v. Briggs*, 475 *U.S.* 335, 341, 106 *S.Ct.* 1092, 1096, 89 *L.Ed.*2d 271, 278 (1986)). "[T]he determination whether it was objectively legally reasonable to conclude that a given [arrest] was supported by probable cause ... will often require examination of the information possessed by the [arresting] officials." *Anderson v. Creighton*, 483 *U.S.* 635, 641, 107 *S.Ct.* 3034, 3040, 97 *L.Ed.*2d 523, 531 (1987). Thus, where the objective-

ly reasonable standard is not met and summary judgment is inappropriate, an officer may still argue "that he reasonably but mistakenly, believed that his [conduct] was justified by the circumstances as he perceived them; this contention, however, must be considered at trial." *Bennett, supra,* 274 *F.*3d at 137.

Applying these principles, we consider first whether the facts, when viewed from defendants' perspective and as alleged by plaintiff, establish that defendants had probable cause or, alternatively, had an objectively reasonable belief that probable cause existed at the time of plaintiff's arrest. "Probable cause is defined as 'a "well grounded" suspicion' that a certain event has occurred." *State v. Perkins,* 358 *N.J.Super.* 151, 159, 817 *A.*2d 364 (App.Div. 2003) (quoting *State v. Waltz,* 61 *N.J.* 83, 87, 293 *A.*2d 167 (1972)). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police,* 71 *F.*3d 480, 483 (3d Cir.1995).

Here, defendants acted as a pursuit team. The police record reveals that the undercover officer had a conversation with the occupant of a black Mercedes with registration TRHEEL. Defendants had difficulty hearing the radio transmission describing the suspect's vehicle, however, at least one heard the vehicle had dealer plates. Although they lost sight of the suspect's vehicle for some time, they nevertheless stopped and arrested plaintiff, who was driving a different model Mercedes with regular plates. Plaintiff was compliant and cooperative. Defendants, nevertheless, arrested plaintiff without asking any questions or looking at his papers. At the time plaintiff was stopped, defendants did not attempt to radio the command post to confirm the description of the suspect's vehicle even though they lost sight of the original vehicle and plaintiff's vehicle did not have the dealer plates they believed were on the suspect's vehicle. Inferentially,

had defendants checked with the command post, they would have learned that they had the wrong vehicle.

These facts convince us that defendants did not have probable cause to arrest plaintiff. Moreover, an examination of the information possessed by the officers, specifically, the knowledge that they lost sight of the suspect's vehicle, which they believed had dealer plates but, nevertheless, arrested plaintiff without questioning him or confirming with the command post the true description of the suspect's vehicle, leads us to the conclusion that defendants did not have an objectively reasonable belief that the arrest was supported by probable cause. In short, objectively reasonable officers would not have arrested plaintiff under these circumstances without making further inquiry.

We come to the same conclusion respecting plaintiff's claim of excessive force. "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso*, 183 *F*.3d 279, 288 (3d Cir.1999). Qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force.' " *Saucier, supra,* 533 *U.S.* at 206, 121 *S.Ct.* 2151 (quoting *Priester v. City of Riviera Beach,* 208 *F*.3d 919, 926 (11th Cir.2000)). As we have previously pointed out, the "test of reasonableness under the Fourth Amendment is whether, under the totality of the circumstances, 'the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Estate of Smith v. Marasco,* 318 *F*.3d 497, 515 (3 Cir.2003) (quoting *Graham v. Connor,* 490 *U.S.* 386, 397, 109 *S.Ct.* 1865, 1872, 104 *L.Ed.*2d 443, 456 (1989)). Factors to consider in this "totality of the circumstances" analysis include:

the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight, as well as the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the

possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

[*Ibid.* (citations omitted).]

Nevertheless,

[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. .. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

[*Graham, supra,* 490 *U.S.* at 396–97, 109 *S.Ct.* 1865, (quoting *Johnson v. Glick,* 481 *F.*2d 1028, 1033 (2d Cir.), *cert. denied,* 414 *U.S.* 1033, 94 *S.Ct.* 462, 38 *L.Ed.*2d 324 (1973)).]

Here, the facts claimed by plaintiff establish that: (1) defendants drew and pointed their guns at him; (2) he was taunted and subjected to verbal abuse both in his vehicle and in the undercover police vehicle; (3) he was grabbed and pulled from his vehicle; (4) he was handcuffed very tightly despite his requests that the handcuffs be loosened.

Defendants contend that the force they used was justified because they believed, from the nature of the offense, that defendant might be armed and dealing in drugs. There are no facts in the record upon which to base such a belief from an objectively reasonable point of view. Instead, when viewed from a totality of the circumstances, the applicable factors militate against a finding that the force used was objectively reasonable: (1) the offense, solicitation of prostitution, was not a crime but a disorderly persons offense, *N.J.S.A.* 2C:34–1(c)(4); (2) plaintiff was compliant and cooperative and he did not pose an immediate threat nor did he actively resist or evade arrest; (3) plaintiff, who was suspected of solicitation of prostitution, was not the individual who would ordinarily be violent or dangerous but instead was the person who normally would be subject to violence at the hands of either a prostitute or a person running a prostitution ring; and (4) plaintiff was alone, while three officers were present. Defendants' alleged actions, when viewed in their entirety, were significant; they did

not amount to a mere pushing or shoving. The circumstances did not objectively embody a tense, uncertain, or rapidly evolving situation that required split-second judgments justifying the force defendants are alleged to have used. Defendants, however, are not prevented from arguing before a jury that their actions were reasonable given their subjective belief under the circumstances. *Bennett, supra,* 274 *F.*3d at 137.

Finally, we consider plaintiff's state law claims under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3. *N.J.S.A.* 59:3–3 provides: "A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."

 "The same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith arising under the Tort Claims Act." *Wildoner, supra,* 162 *N.J.* at 387, 744 *A.*2d 1146. Thus, the central issue, again, is whether defendants had probable cause to arrest and, if not, whether it was objectively reasonable for them to believe that probable cause existed. *Ibid.* Because we have determined that probable cause was not present and it was not objectively reasonable under the circumstances for the officers to believe that probable cause existed, defendants are not entitled to summary judgment under the good faith immunity, *N.J.S.A.* 59:3–3. As with Section 1983 claims, however, defendants' subjective good faith remains available as "a second line of defense, which may be raised at trial," even though they were not acting in an objectively reasonable manner. *Fielder v. Stonack,* 141 *N.J.* 101, 132, 661 *A.*2d 231 (1995); *Mesgleski v. Oraboni,* 330 *N.J.Super.* 10, 25, 748 *A.*2d 1130 (App.Div.2000).

The fact that *N.J.S.A.* 59:3–3 is not available to defendants as a matter of law does not end our inquiry. In granting summary judgment, the motion judge essentially found that plaintiff's physical injuries did not meet the *Brooks v. Odom,* 150 *N.J.* 395, 696 *A.*2d 619 (1997), standard. She reasoned:

Dr. Hoppenstein noted that, following [plaintiff's] cervical surgery, he "was able to walk a mile a day and his [previous] urinary problems had abated." After [plaintiff's] second surgery, Dr. Hoppenstein noted that [plaintiff's] wounds were healing well and that "he was now able to walk a mile a day and his pre-operative symptoms were absent and was neurologically intact."

Moreover, [plaintiff] has failed to make any showing that he is physically restricted in carrying out his daily work and/or recreational activities. [Plaintiff] testified that he currently works ten-hour days, six days per week. He has not indicated that he is now physically unable to do anything that he had done prior to the June 11, 1998 arrest or prior to the car accident that occurred on January 15, 1997. Without such evidence, [plaintiff] cannot meet the second, subjective prong of the *Brooks* test.

In order to "vault the pain and suffering threshold under the Tort Claims Act, a plaintiff must satisfy a two-pronged standard by proving (1) an objective permanent injury, and (2) a permanent loss of a bodily function that is substantial." *Gilhooley v. County of Union*, 164 *N.J.* 533, 540–41, 753 *A.*2d 1137 (2000). Gilhooley fractured her patella and required reconstructive surgery involving the use of pins and wire. *Id.* at 536, 753 *A.*2d 1137. She recovered from her surgery and returned to work in her full capacity. *Id.* at 537, 753 *A.*2d 1137. Her surgeon claimed that she was as good as new. The Court determined Gilhooley's injuries were "more akin to the permanent dismemberment or permanent disfigurement categories in *N.J.S.A.* 59:9–2(d)...." *Id.* at 541–42, 753 *A.*2d 1137. Describing the legislative intent, the Court observed:

We are satisfied that the Legislature intended to include within the notion of aggravated cases those involving permanent injury resulting in a permanent loss of normal bodily function even if modern medicine can supply replacement parts to mimic the natural function. As is the case with dismemberment and disfigurement, when pins, wires, mechanisms and devices are required to make the plaintiff normal, the statutory standard is met. The fact that a physician has jury-rigged the knee to function with pins and wires in no way inhibits the characterization of that injury as the permanent loss of bodily function.

[*Id.* at 542–43, 753 *A.*2d 1137.]

Here, plaintiff underwent back and neck surgery requiring the fusion of three vertebrae in his neck and three in his lower back. Although the surgery did not involve the installation of hardware as in *Gilhooley*, it nevertheless represents a significant surgical intervention, which changed the structure of the vertebral

bodies and normal bodily function. Plaintiff is now subject to decreased mobility and more susceptible to damage to the discs above and below the fusions. Plaintiff's injury meets the permanent dismemberment and disfigurement standard set forth in *Gilhooley*. Even though there is evidence that plaintiff sustained a neck injury in a prior accident and suffered from pre-existing degenerative disease in both his cervical and lumbar spine, Dr. Hoppenstein's September 21, 2000 report established a causal relationship, albeit disputed by defendants' medical proofs.

Accordingly, we reverse and remand the matter for trial.