870 A.2d 259

ALBERTO DELACRUZ AND LENITA DELACRUZ, HIS WIFE, PLAINTIFFS–RESPONDENTS AND CROSS–PETITIONERS, v. BOROUGH OF HILLSDALE, BOROUGH OF HO–HO–KUS, BOROUGH OF SADDLE RIVER, TOWNSHIP OF WASHINGTON, POLICE DEPARTMENT OF THE BOROUGH OF HILLSDALE, POLICE DEPARTMENT OF THE BOROUGH OF HO–HO–KUS, POLICE DEPARTMENT OF THE TOWNSHIP OF SADDLE RIVER, POLICE DEPARTMENT OF THE TOWNSHIP OF WASHINGTON, OFFICER ROBERT LABIANCA, OFFICER FRANK NOVAKOWSKI, SERGEANT ROBERT BREESE, OFFICER EUGENE SCHULTZ AND SERGEANT ROBERT ORR, DEFENDANTS–PETITIONERS AND CROSS–RESPONDENTS, AND JOHN DOES 1–10 (SAID NAMES BEING FICTITIOUS), DEFENDANTS.

Argued September 28, 2004—Decided April 12, 2005.

152

*Christopher C. Botta* argued the cause for appellants and cross respondents (*Botta & Carver*, attorneys).

*Richard S. Lehrich* argued the cause for respondents and cross appellants.

*Karen L. Jordan*, Deputy Attorney General, argued the cause for *amicus curiae*, State of New Jersey (*Peter C. Harvey*, Attorney General of New Jersey, attorney; *Patrick DeAlmeida*, Deputy Attorney General, of counsel).

Justice RIVERA–SOTO delivered the opinion of the Court.

These cross-appeals require that we address two discrete but related issues: (1) does the verbal threshold of the New Jersey Tort Claims Act, *N.J.S.A.* 59:9–2(d), apply to common law false arrest/false imprisonment claims against police officers, and (2) does a police officer's subjective good faith raise a defense to causes of actions for state law false arrest/false imprisonment and under the Federal Civil Rights Act, 42 *U.S.C.A.* § 1983 (§ 1983).

We hold that the Tort Claims Act's verbal threshold applies to common law false arrest/false imprisonment claims. We further hold that, under *N.J.S.A.* 59:3–3, a police officer's subjective good faith belief as to the propriety of his/her actions is irrelevant as to liability for any false arrest or false imprisonment claims. In false

arrest/false imprisonment cases, the only relevant inquiry is whether, on an objective basis, the police officer's actions were proper. We also hold that a police officer's subjective good faith belief may not constitute a defense at trial to a § 1983 Federal Civil Rights Act claim when the police officer's actions are not otherwise shielded from liability by the doctrine of qualified immunity.

I.

Starting in early 1997, several neighboring Bergen County communities suffered from a series of burglaries that led local law enforcement officials to believe that their communities were being targeted by a band of professional burglars. Among the affected communities were the Borough of Saddle River, the Borough of Hillsdale, the Borough of Ho–Ho–Kus, and the Township of Washington. In an effort to stem, if not stop, this plague, the Saddle River Police Department, with the assistance of the Bergen County Prosecutor's Office, spearheaded a multi-jurisdictional task force designed to speed up the police response time to burglaries as well as to minimize the delays inherent in fractionalized law enforcement efforts that cross municipal boundaries. This task force was to be simple in its operation: once a burglary was reported, the police forces of the contiguous communities would form a cordon around the victimized community in an effort to catch the culprits as they tried to escape.

The early evening of October 24, 1997 brought with it two burglaries in Saddle River, the first one block away from the second. The Saddle River Police Department triggered the task force response, and officers from the surrounding communities of Waldwick, Allendale, Woodcliff Lake, Montvale, Ho–Ho–Kus, Washington Township, Hillsdale, Mahwah, and Ramsey formed a cordon around Saddle River's borders. Also brought in were the services of a helicopter from the Sheriff's Department of neighboring Rockland County.

Sergeant (later Lieutenant) Robert Breese of the Saddle River Police Department was responsible for coordinating that evening's law enforcement efforts. Immediately after responding to yet a third burglary call of that evening, Sergeant Breese was dispatched to a location approximately one-half mile away where officers of the Ho–Ho–Kus, Hillsdale, and Washington Township police departments had stopped a white van and detained its occupants. When Sergeant Breese arrived at the location of the stop, the driver of the white van, plaintiff Alberto DelaCruz, was handcuffed behind his back and face down on the ground.

Plaintiff, then a 45–year–old self-employed air conditioning, heating, ventilation and refrigeration contractor and the married father of three children, had just completed two days of work at the home of plaintiff's customer, a Saddle River physician. As plaintiff and his co-workers were leaving the worksite, the customer returned home and, pulling into the driveway, asked plaintiff, who was driving, in which direction he was heading. When plaintiff explained where he was going, the customer told plaintiff that there was a police checkpoint along that route—the flashing lights of the checkpoint were visible from the driveway—and recommended that plaintiff turn in the opposite direction to spare himself what looked like a twenty-minute delay. Plaintiff thanked his customer for the suggestion and headed in the opposite direction from the checkpoint.

Shortly after turning in the direction the customer recommended, plaintiff saw the flashing lights of a police car in his rear view mirror. Plaintiff testified at trial as follows:

Q  All right. What happened when you saw the flashing lights?

A  When I saw the flashing lights, I just pulled over right away knowing that a regular police would ask your driver license or insurance. So I pulled over with no hesitation. As soon as he turn his lights on, I pulled over to the right.

Q  What happened after that?

A  Then all of a sudden, I could see this—the police come out of the—you, he says. Pull out the gun right away. I could see it in my side mirror. And I don't know what to do. I was panicking. My—both knees were shaking.

Q  How close was the officer to you when you first saw him?

A   He was in—he was in the side of my truck. You know, it's away—I would say three feet away from the truck, but it's in the side. I—you know, because I could see him in my side mirror, and I don't know what to do. He was pointing a gun. So I says—so he says, driver. He says, open the door. That's how I really, really—I—driver, he says, open your window and let your—raise your left hand and open the door with your right hand.

Q   Do you know which officer was talking to you at that time?

A   I—he was referring to me, the driver, aiming a gun, was pointing at me through the door. So I says, I don't know what I—so I told him while I was— Officer, what did I do, you know, what did I do. I was keep repeating those words. I says, please. So he says, you, mother f**ker. He says, get out of the truck. You know, so I get more nervous. So a minute after that, there's another cop came over in front of me, you know, or the truck. And they made a big scene. I mean, the lights are on pulsing. So I get more nervous. I don't know what to do. I thought I'm going to be dying, and I was just praying. I says, please, I hope I don't really—you know, I hope I see my family again.

So as I walk back towards the truck, he says—and he kept—please, Officer, I says, please I have my credential on my wallet, my back pocket, please open them up, I have—

Q   I'm sorry. I couldn't understand you.

A   I have my wallet, you know, my credentials, pull them out, and I have an invoice for the doctor, would you please call him up, you know. But the policeman don't even want to listen. So I said—I was walking 'cause I was scared. I don't know what to do. I was—he says, walk faster. He was cursing. You know, the other guy was blocking the walk. And then he says, kneel down. As soon as I kneel down, he kind of push me. And I says, what did I do. He puts his knees in my back and put the handcuff like that. So I says—I was crying. I said, please, Officer, what did you do to me. I says, would you please call [the physician/customer]. They would not listen.

So probably ten minutes later, another police came, and I could hear it. And he says—I heard something like, you went too far with this.

Q   I'm sorry. You have to—

A   You went too far. In other words all of a sudden with my handcuff on, two police came over and trying to lift me. I says, please, don't lift me up, just let me down on the ground with my handcuff on. So the—one of the officer tried to loosen up the key, but it won't fit on his—on my handcuff. So I heard he go, okay, don't—my keys don't fit on this. So one officer threw keys to the other officer and loosen up my—the handcuff.

And then soon as they took the handcuffs off, I was laying down facing the ground. They trying to pick me up. I says, please, let me just lay down for a while because you're hurting me. I was really, really begging the police, please, don't do it, you know.

After explaining that he had his driver's license, registration card and proof of insurance all in order but was never asked for

them, plaintiff testified concerning his earlier experiences with law enforcement authorities:

Q   Have you ever been arrested in your life?

A   Never.

Q   Do you have any kind of criminal record at all?

A   No.

Q   Have you ever looked at a police gun before?

A   That's why I was so scared because I got pulled over with a State Trooper. It's not cursing you out and aiming a gun at you. I was shocked. The first time it ever happened to me.

Plaintiff described the length and conclusion of the exchange as follows:

Q   Mr. DelaCruz, how long would you estimate you were in the handcuffs?

A   I would say about 10, 15 minutes.

. . . .

Q   And what happened after you got up?

A   After I got up, one officer told me, oh, now I remember you, you are the contractor who's doing the doctor's house on the corner. I says, I've been telling that long time ago, I was begging them. And he says—

Q   Do you know which officer said that to you?

A   I couldn't remember a face, but he says to me, did I—we scare you, we're just doing the normal procedure. So I said, Officer, I'm tired, just let us go. That's why he let us go.

Officer Frank Novakowski of the Hillsdale Police Department testified that he was aware of the burglary task force created in order to address the spate of burglaries afflicting Bergen County. Officer Novakowski testified that he was on duty on the evening of October 24, 1997 when he received a dispatcher's call that there had been additional burglaries in Saddle River and that Saddle River had requested Hillsdale's assistance in setting up a perimeter. Together with Officer Labianca of the Washington Township Police Department, Officer Novakowski separately responded to the three-way intersection of Mill, Jacqueline, and Chestnut Ridge Roads, where they were on the lookout for "any traffic that might be trying to get out of the burglary area or a car going in to pick up the burglars."

According to Officer Novakowski, Officers Novakowski and Labianca saw plaintiff's van, and pulled it over thinking "that we had the suspect vehicle. I—I thought that we had the—the burglars." For safety reasons, Officer Novakowski drew his weapon and, from the shelter of his opened car door, instructed plaintiff, as the driver of the van, to turn off the van and "place his hands outside the window where [the officer] could see them." When plaintiff complied, Officer Novakowski ordered plaintiff to "remove the keys from the ignition and take those keys and drop them outside the van." Plaintiff again complied. Officer Novakowski

ordered the—the driver to open the car door, the van door using his right hand from the outside. I wanted to keep his—for my safety, I wanted to keep his hands in view at all time.

Q  And did he?

A  Yes, he did.

. . . .

Q  What happened next?

A  I instructed him to exit the van and face forward. I told him to keep his hands up in the air where I could see them, that way he couldn't pull out any concealed weapon that he might have had. I then ordered him to walk backwards toward the sound of my voice.

Q  And did he do all these things that you told him to do?

A  Yes, he did.

. . . .

Q  What happened next?

A  I had him proceed walking backwards until he got just—just past the back of his van, at which point I told him to slowly go down to his knees to the—to the road, maintaining his hands in the air. When he got down into that position, I told him to lay down on the ground.

Q  And did he?

A  Yes, he did.

Q  All right. And what happened next?

A  At that time, Officer Schultz from Ho-ho-kus had arrived and he took up a position next to me. He was in plain clothes. I noticed that he didn't—he didn't have his uniform on, his—his gun or anything. I handed him my handcuffs.

. . . .

Q   So you gave the handcuffs to Officer Schultz.  What happened next?

A   He—he walked up to the—to the suspect.  I maintained cover from my car and Officer Schultz patted him down and then handcuffed.

. . . .

Q   What happened next after the handcuffs were applied by [Officer] Schultz?

A   I believe at that time Officer Labianca had the—the person in the front passenger seat exit and walk back towards him.  In that time, within a couple of minutes, additional officers arrived.

Q   And then what happened?

A   I remember the rest of the occupants of the van were taken out.

Q   Did you have anything to do with taking them out?

A   No. No. Officer—I'm sorry, Lieutenant Breese arrived.  He walked over to—to Mr. DelaCruz and at that time I—I had walked over to the curb where several of the other subjects were sitting down.

In all material respects, the account of these events from the witnesses at trial is remarkably similar.  The differences lie in plaintiff's testimony concerning, and the police officers' denial of, the use of profanity, and plaintiff's claim, and the police officers' denial, of rough handling immediately preceding and during the time plaintiff was handcuffed.  As a result of the alleged rough handling, plaintiff testified that, two days later, he sought medical attention for pain to his shoulder and back, which was treated by rest and a mild sedative and subsided completely within one week. Plaintiff testified that the effect these events had on his mental state were more lasting, and his wife testified as to her resulting loss of consortium claim.  Plaintiff proffered no expert testimony as to any psychiatric or psychological injuries as a result of these events.

## II.

In 1999, plaintiff and his wife filed an action against the Boroughs of Hillsdale, Ho–Ho–Kus, and Saddle River, and Washington Township;  their respective police departments;  Officers Novakowski, Labianca, and Schultz;  Lieutenant Breese and Sergeant Robert Orr of the Ho–Ho–Kus Police Department;  and

unnamed fictitious defendants. Plaintiff alleged that the actions of those municipalities, their police departments and their individual police officers on the evening of October 24, 1997 gave rise to liability either under the common law torts of false arrest/false imprisonment or constituted a deprivation of civil rights through state action proscribed by the Federal Civil Rights Act.[1]

Trial started on May 1, 2002. At the close of the evidence, the trial court dismissed, as a matter of law, all of plaintiff's federal claims under § 1983 against all of the defendants as well as all of plaintiff's state law claims against the municipal defendants. Plaintiff's sole surviving state law claim was that Officers Novakowski and/or Schultz used excessive force, first by placing the handcuffs on plaintiff and later when lifting him off the ground while removing the handcuffs. The jury rendered a verdict in favor of plaintiff and against Officers Novakowski and Schultz and awarded $20,000 in compensatory damages; the jury declined to assess any punitive damages. The trial court later awarded $71,195 in attorneys' fees and $3,099 in costs.

On appeal to the Appellate Division, plaintiff claimed that the trial court erred in: (1) finding that the defendants were entitled to qualified immunity so as to bar liability under the Federal Civil Rights Act; (2) dismissing plaintiff's common law false arrest/false imprisonment claims as barred by the verbal threshold provision of the Tort Claims Act, *N.J.S.A.* 59:9–2(d); (3) barring plaintiff from testifying about the psychiatric treatment he claimed to have received as a result of his encounter with Officers Novakowski and Schultz; (4) failing to respond to a jury question; and (5) determining the attorneys' fee award. Officers Novakowski and Schultz cross-appealed, arguing that the trial court should have granted their motion for a directed verdict on the excessive force claims, and should have denied plaintiff's application for attorneys' fees in its entirety as plaintiff was not the "prevailing party" under the Federal Civil Rights Act.

---

[1] The independent claims pressed by plaintiff's wife were all derivative and need not be separately addressed.

The Appellate Division determined that, while the original stop of plaintiff was entitled to qualified immunity, the detention and handcuffing of plaintiff was not. *DelaCruz v. Borough of Hillsdale*, 365 *N.J.Super.* 127, 146, 838 *A.2d* 498 (App.Div.2004). As a result, the Appellate Division held that plaintiff's § 1983 Federal Civil Rights Act claims were not barred by the doctrine of qualified immunity. *Id.* at 153, 838 *A.2d* 498. The panel also held that the verbal threshold of the Tort Claims Act does not apply to false arrest/false imprisonment claims. *Id.* at 149–51, 838 *A.2d* 498. In so doing, the panel candidly admitted that its "analysis and conclusions here are at odds with the holding in *Marion v. Borough of Manasquan*, [231 *N.J.Super.* 320, 555 *A.2d* 699 (App. Div.1989) ]." *Id.* at 148, 838 *A.2d* 498. Ultimately, the Appellate Division remanded for entry of judgment in favor of plaintiff and his wife on their common law false arrest/false imprisonment claims and for trial only on the type and quantum of damages. *Id.* at 153, 838 *A.2d* 498. The Appellate Division cautioned, however, that plaintiff, while allowed to pursue two separate theories of liability, was entitled to only one recovery, and instructed the trial court to charge the jury accordingly.

Defendants sought certification on the single issue whether, in the absence of physical or emotional injury, the verbal threshold of the Tort Claims Act bars a claim for false arrest/false imprisonment. Plaintiff cross-petitioned for certification limited also to a single issue: whether the good-faith defense is available in a § 1983 Federal Civil Rights Act claim for false arrest and excessive force. We granted both defendants' petition for certification and plaintiff's cross-petition for certification, 179 *N.J.* 370, 845 *A.2d* 1253 (2004), as well as the application of the State of New Jersey for leave to appear *amicus curiae*. We affirm in part and reverse in part the judgment of the Appellate Division.

### III.

We first address the issue whether the trial court correctly dismissed plaintiff's false arrest and false imprisonment claims as

barred by the verbal threshold requirement of the Tort Claims Act (Act). The Act provides that

> [n]o damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.
>
> [*N.J.S.A.* 59:9–2(d).]

It is admitted that, if the verbal threshold applies to plaintiff's false arrest/false imprisonment claims, those claims are barred. As noted earlier, the Appellate Division held that the Act's verbal threshold is inapplicable to false arrest/false imprisonment claims, reasoning that *N.J.S.A.* 59:3–3 exempts false arrest and false imprisonment claims from the reach of the verbal threshold bar. We disagree.

*N.J.S.A.* 59:3–3 provides in full:

> A public employee is not liable if he acts in good faith in the execution or enforcement of any law. *Nothing in this section* exonerates a public employee from liability for false arrest or false imprisonment.
>
> [(Emphasis supplied).]

The comment immediately following that section states, in relevant part:

> This section does not, however, immunize law enforcement officials from false arrest and false imprisonment. It is recognized that law enforcement officers are not now immune in the State of New Jersey and it is believed that existing principles of law provide sufficient protection for the officer from frivolous suits. Therefore it is the intent of this section to emphasize the importance of compensating a citizen whose freedom has been unreasonably restricted.
>
> [*Report of the Attorney General's Task Force on Sovereign Immunity* 216–17 (1972).]

Based on that comment, the Appellate Division reasoned that *N.J.S.A.* 59:3–3 exempts false arrest and false imprisonment claims against law enforcement officers from the verbal threshold bar of the Act. As a result, the Appellate Division reinstated plaintiff's false arrest and false imprisonment claims against all of the defendants, instructed the trial court to enter judgment of liability on those claims in favor of plaintiff and against all of the defendants, and ordered a trial solely on the issue of damages.

The Appellate Division read *N.J.S.A.* 59:3-3 and its comment too broadly. We have often explained that

[w]hen dealing with questions of statutory construction, the Court first considers the plain meaning of the provision at issue. Such language should be given its ordinary meaning, absent a legislative intent to the contrary. When a statute is silent or ambiguous, however, the Court must interpret the statute in light of the Legislature's intent. In order to ascertain legislative intent, the Court may look to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction. The primary task for the [C]ourt is to effectuate the legislative intent in light of the language used and the objects sought to be achieved.

[*Burns v. Belafsky,* 166 *N.J.* 466, 473, 766 *A.*2d 1095 (2001) (citations and internal quotation marks omitted).]

*See also N.J.S.A.* 1:1-1 ("In the construction of the laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language.").

■ By its unambiguous and specific terms, *N.J.S.A.* 59:3-3 creates an objective good faith defense to a claim that a public employee acted improperly in the execution or enforcement of the laws of this State, an objective good faith defense that does not, in and of itself, "exonerate[ ] a public employee for false arrest or false imprisonment." The objective good faith defense provided in *N.J.S.A.* 59:3-3 does not apply to false arrest or false imprisonment claims. However, in order to be viable, such claims must still comply with all other provisions of the Act and, here, as admitted, plaintiff's false arrest/false imprisonment claims do not vault the verbal threshold requirements of *N.J.S.A.* 59:9-2(d).

Our reading of *N.J.S.A.* 59:3-3 is also consonant with the comment's import that "[t]his section does not, however, immunize law enforcement officials from false arrest and false imprisonment," that "law enforcement officers are not now immune in the State of New Jersey," and that "existing principles of law provide sufficient protection for the officer from frivolous suits." *Report*

*of the Attorney General's Task Force on Sovereign Immunity* 216–17 (1972). As we described above, *N.J.S.A.* 59:3–3 only denies a public employee a good faith defense in false arrest/false imprisonment claims. *N.J.S.A.* 59:3–3 does not suggest that because a good faith defense is unavailable for such claims that a plaintiff is relieved of complying with other provisions of the Tort Claims Act, such as the verbal threshold contained in *N.J.S.A.* 59:9–2(d).[2]

■ We, therefore, reject the reasoning of the Appellate Division in this case because the panel, by its broad reading of *N.J.S.A.* 59:3–3, needlessly eliminates other provisions of the Tort Claims Act applicable to false arrest/false imprisonment claims. Rather, we endorse the reasoning of *Marion v. Borough of Manasquan*, 231 *N.J.Super.* 320, 331–32, 555 *A.2d* 699 (App.Div. 1989), that false arrest/false imprisonment claims against municipalities and their public employees for pain and suffering must first vault the verbal threshold of the Tort Claims Act in order to be compensable. We are confident that, given the passage of time since *Marion* was decided and the Legislature's inaction in addressing *Marion's* holding, *Marion* represents a more faithful adherence to the Legislature's purpose in adopting the Tort Claims Act.

■ Nothing in the Act exempts false arrest/false imprisonment claims from the reach of the verbal threshold requirement of *N.J.S.A.* 59:9–2(d). Also, the effect of the verbal threshold is limited to pain and suffering claims; economic or consequential damages are not limited by the Act. Finally, the need to vault the verbal threshold is not limited to false arrest or false imprisonment claims; the Act makes no such distinctions and, instead, treats all torts similarly. The clear terms of the Tort Claims Act

---

[2] Defendants' arguments subsume a general assertion that their subjective good faith behavior is relevant. We explicitly reject that assertion and reaffirm that, in this setting, a defendant police officer's subjective good faith is relevant only on the issue of punitive damages.

require that all claims—including those for false arrest and false imprisonment—must vault the verbal threshold in order to be cognizable.

## IV.

■ We turn, then, to the issue certified on plaintiff's cross-petition: is good faith a defense available in a § 1983 Federal Civil Rights Act claim for false arrest and excessive force. The Appellate Division, citing *Fielder v. Stonack*, 141 *N.J.* 101, 132, 661 *A.*2d 231 (1995), and *Leopardi v. Tp. of Maple Shade*, 363 *N.J.Super.* 313, 332, 832 *A.*2d 943 (App.Div.2003), ruled that Officers Novakowski and Labianca "are still entitled to raise their subjective good faith as a second line of defense to plaintiff's federal claims under § 1983." *DelaCruz v. Borough of Hillsdale, supra*, 365 *N.J.Super.* at 151, 838 *A.*2d 498. We disagree. Plaintiff's § 1983 Federal Civil Rights Act claims are governed by federal precedent. Under that precedent a law enforcement officer's state of mind is irrelevant to the issue of liability premised on an unlawful search or seizure in violation of the Fourth Amendment.

As the United States Supreme Court painstakingly explained in *Graham v. Connor*, 490 *U.S.* 386, 396, 109 *S.Ct.* 1865, 1872, 104 *L.Ed.*2d 443, 455 (1989):

Because "[t]he test of *reasonableness* under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 *U.S.* 520, 559 [99 *S.Ct.* 1861, 1884, 60 *L.Ed.*2d 447] (1979) . . ., its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *See Tennessee v. Garner*, 471 *U.S.*, [1] at 8–9, 105 *S.Ct.*, [1694] at 1699–1700[, 85 L.Ed.2d 1 (1985)] (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

The *"reasonableness"* of a particular use of force must be judged *from the perspective of a reasonable officer on the scene*, rather than with the 20/20 vision of hindsight. *See Terry v. Ohio, supra*, 392 *U.S.*, [1] at 20–22, 88 *S.Ct.*, [1868] at 1879–1881[, 20 *L.Ed.*2d 889 (1968)]. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, *Hill v. California*, 401 *U.S.* 797, 91 *S.Ct.* 1106, 28 *L.Ed.*2d 484 (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, *Maryland v. Garrison*, 480 *U.S.* 79, 107 *S.Ct.* 1013, 94 *L.Ed.*2d 72 (1987). With respect to a claim of

excessive force, the *same standard of reasonableness at the moment applies*: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 *F*.2d, at 1033, violates the Fourth Amendment. The *calculus of reasonableness* must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, *the "reasonableness" inquiry in an excessive force case is an objective one*: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, *without regard to their underlying intent or motivation*. *See Scott v. United States*, 436 *U.S.* 128, 137–139, 98 *S.Ct.* 1717, 1723–1724, 56 *L.Ed.*2d 168 (1978); *see also Terry v. Ohio, supra*, 392 *U.S.*, at 21, 88 *S.Ct.*, at 1879 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). *An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional*. *See Scott v. United States, supra*, 436 *U.S.*, at 138, 98 *S.Ct.*, at 1723[ (]citing *United States v. Robinson*, 414 *U.S.* 218, 94 *S.Ct.* 467, 38 *L.Ed.*2d 427 (1973)[)* ].

[490 *U.S.* at 396–97, 109 *S.Ct.* at 1872, 104 *L.Ed.*2d at 455–56 (emphases supplied).]

▆▆▆ The rule is thus clear. When a § 1983 Federal Civil Rights Act claim is leveled against a law enforcement officer for an alleged deprivation of Fourth Amendment rights, his or her conduct is to be evaluated through an objective lens that focuses on what a reasonable officer would have done under the circumstances. This is not to say that the law enforcement officer's version of the events is irrelevant. On the contrary, the law enforcement officer of course may argue that the *facts* that existed at the time of the incident are different from the plaintiff's version. *See Graham, supra*, 490 *U.S.* at 397, 109 *S.Ct.* at 1872, 104 *L.Ed.*2d at 456 (the "question is whether the officers' actions are 'objectively reasonable' *in light of the facts and circumstances confronting them*" (emphasis supplied)).

▆▆▆ To the extent that *Leopardi v. Tp. of Maple Shade*, 363 *N.J.Super.* 313, 327, 832 *A.*2d 943 (App.Div.2003), *certif. granted*, 179 *N.J.* 370, 845 *A.*2d 1253 (2004), suggests otherwise, it is based upon a misreading of *Bennett v. Murphy*, 274 *F.*3d 133, 137 (3d Cir.2002). To be sure, the Court in *Bennett* stated that, at trial, "[a]n officer may still contend that he *reasonably, but mistakenly*,

*believed* that his use of force was justified by the *circumstances as he perceived them* ...." *Ibid.* (emphasis supplied). In light of *Graham*, however, that language can only mean that an officer is free to argue that his conduct was reasonable in conjunction with his version of the *facts*. Nothing in *Bennett* can be interpreted as holding that an officer's state of mind is relevant to, much less dispositive of, a false arrest or false imprisonment claim brought under the Federal Civil Rights Act. Indeed, *Bennett's* citation to *Saucier v. Katz*, 533 *U.S.* 194, 121 *S.Ct.* 2151, 150 *L.Ed.*2d 272 (2001), a case that reaffirms the objective nature of the inquiry, lays the contrary notion to rest. *See, e.g.*, O'Malley, et al., *3B Fed. Jury Prac. & Instr.* § 165.23 (5th ed.) ("The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with hindsight."). It is only in the narrow band of cases in which a "plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive," for example malice, that a subjective inquiry is appropriate. *Crawford–El v. Britton*, 523 *U.S.* 574, 597–99, 118 *S.Ct.* 1584, 1596–97, 140 *L.Ed.*2d 759, 779–80 (1998). That is obviously not the situation here.

Therefore, we reiterate what is already clear federal precedent: a law enforcement officer's state of mind is irrelevant to the issue of liability on a § 1983 Federal Civil Rights Act claim premised on an unlawful search or seizure in violation of Fourth Amendment rights.

## V.

There can be no doubt that plaintiff's experience at the hands of law enforcement on October 24, 1997 was, to say the least, harrowing. By the same token, we are mindful that, in judging the reasonableness of a police officer's conduct in this setting, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particu-

lar situation." *Graham v. Connor, supra,* 490 *U.S.* at 396–97, 109 *S.Ct.* at 1872, 104 *L.Ed.2d* at 455–56. However, we are called on to determine not the equities of plaintiff's claims or of the police officers' defenses, but whether those claims or defenses are cognizable as a matter of law.

We find that false arrest/false imprisonment claims against public entities and employees must nevertheless meet the verbal threshold of the Tort Claims Act. On the flip side, we are also mindful of the extreme circumstances under which law enforcement personnel must operate and we are loathe to gauge their behavior solely under the unforgiving glare of perfect hindsight. Thus, if the police officer's actions were objectively reasonable, the officer will be entitled to qualified immunity. In those circumstances where qualified immunity is unavailable for claims asserted as either common law torts or under the Federal Civil Rights Act because the police officers either (1) did not act with probable cause or (2) in the absence of probable cause, an objectively reasonable police officer would not have believed in its existence, that police officer's subjective good faith is relevant only as to the issue of punitive or exemplary damages.

The judgment of the Appellate Division remanding the matter to the Law Division for trial as to plaintiff's § 1983 claims is affirmed; the judgment of the Appellate Division remanding plaintiff's state law claims for entry of judgment of liability and for trial on damages is reversed; the matter is remanded to the Law Division for entry of judgment in favor of defendants and against plaintiff on plaintiff's state law tort claims and for trial as to plaintiff's § 1983 claims in accordance with this opinion; and the award of attorneys' fees is vacated and must abide the result of the trial of plaintiff's § 1983 claims.

Justice LONG, concurring in part and dissenting in part.

I am in full agreement with the Court's conclusion that 42 *U.S.C.* § 1983 renders a police officer's subjective good faith irrelevant to an assessment of liability for false arrest or false

imprisonment. I part company from my colleagues in connection with their additional determination that the verbal threshold, embodied in *N.J.S.A.* 59:9–2(d), applies to plaintiffs' state claims involving false arrest.

Under the verbal threshold, a plaintiff may not recover damages against a public entity for pain and suffering resulting from any injury that is not permanent and substantial. *Brooks v. Odom*, 150 *N.J.* 395, 406, 696 *A.*2d 619 (1997). As this case demonstrates, false arrest, unless coupled with other tortious conduct, is unlikely to cause permanent injury. As a result, under the majority's view, most false arrests will go unremedied. I do not believe that was what the Legislature intended.

Although the Tort Claims Act does not clearly exclude false arrest claims from the ambit of the verbal threshold, that does not end the inquiry. As Chief Justice Weintraub observed:

It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design. It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end "words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms."

*Alexander v. New Jersey Power & Light Co.*, 21 *N.J.* 373, 378 [122 *A.*2d 339] (1956); *Wright v. Vogt*, 7 *N.J.* 1, 6 [80 *A.*2d 108] (1951); *Glick v. Trustees of Free Public Library*, 2 *N.J.* 579, 584 [67 *A.*2d 463] (1949).

[*New Capitol Bar & Grill Corp. v. Div. of Employment Sec.*, 25 *N.J.* 155, 160, 135 *A.*2d 465 (1957).]

With that teaching in mind, it seems clear that the failure of the Legislature specifically to carve false arrest out of the verbal threshold was an oversight. The essential purpose of the Tort Claims Act is to insulate governmental entities from having to answer for minor incidents and injuries. Ordinarily, the requirements of permanency and substantiality denote the kind of seriousness the Act was intended to remedy. That is simply not the case with false arrest.

The injury at the heart of false arrest is different in kind. It is the deprivation of liberty, an unspeakable personal and societal affront by the government against the people, that, standing alone, cannot be tolerated. It is, by its very nature, substantial and serious whether or not it has permanently affected the victim. As Judge Fuentes observed in the Appellate Division opinion below:

> One who is wrongfully deprived of freedom does not necessarily suffer from a denial of the necessities for maintaining a physical existence. Nor can the signs of unlawful confinement be detected by conducting a physical examination of the victim. As noted by the Supreme Court of California in *Sullivan v. County of Los Angeles*, 12 *Cal.*3d 710, 117 *Cal.Rptr.* 241, 527 *P.*2d 865, 868 (1974), "[i]n a false imprisonment case, the 'injury' suffered by an individual is the illegal confinement itself rather than any detriment occurring after imprisonment . . . ." One who is wrongfully deprived of freedom sustains an intangible injury, the magnitude of which cannot be measured or assessed in physical terms. Although this injury may, in some cases, also cause psychological or emotional trauma, a victim of false arrest/false imprisonment need not experience such trauma to have a legally compensable claim.
>
> [*DelaCruz v. Borough of Hillsdale*, 365 *N.J.Super.* 127, 150, 838 *A.*2d 498 (App.Div. 2004).]

By its opinion, this Court leaves that violation essentially un-remedied and undeterred save for cases that, by happenstance, involve permanent injury resulting from separately actionable claims of excessive force. I do not read the Tort Claims Act in that confined way; nor do I believe that the Legislature, which took pains to underscore its continued abhorrence of false arrest in *N.J.S.A.* 59:3–3, intended that execrable official act to go unremedied. As we have said, "a right without a remedy is a mere shadow." *State by Parsons v. Standard Oil Co.*, 5 *N.J.* 281, 295, 74 *A.*2d 565 (1950), *aff'd*, 341 *U.S.* 428, 71 *S.Ct.* 822, 95 *L.Ed.* 1078 (1951). No "court of conscience" should permit such a result. *In re Mossavi*, 334 *N.J.Super.* 112, 122, 756 *A.*2d 1076 (Ch.Div. 2000). For those reasons, I dissent.

*For affirmance in part/reversal in part/remandment*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA–SOTO—6.

*For concurring in part/dissenting in part*—Justice LONG—1.